STATE of Utah, Plaintiff and Respondent,

v.

Michael Patrick MOORE, Defendant and Appellant.

No. 18737.

Supreme Court of Utah.

Feb. 1, 1985.

Jo Carol Nesset-Sale, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

The defendant, Michael Patrick Moore, appeals from his conviction of two counts of criminal homicide, murder in the first degree, for which he was sentenced to a life sentence on each count. He argues two points on appeal: that the trial court erred in not suppressing his confession which he contends was taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the

trial court erred in not dispensing with the death qualification questions on the voir dire of the jury. We affirm.

The facts concerning the homicide need not be related in any detail; they are essentially undisputed. Michael Patrick Moore was the manager for Log Haven Restaurant from 1979 until March of 1982. In March, Moore learned that Jordan Rasmussen, the accountant for a corporation that had recently acquired Log Haven, was to replace him as manager of Log Haven. The news was highly upsetting to Moore, particularly because he had put a great deal of time and effort into his job. On March 4, 1982, Moore made an appointment with Rasmussen for the next morning to discuss business of the restaurant.

The following morning, Friday March 5, 1982, around 7:30 a.m., Moore met Rasmussen at the mouth of Millcreek Canyon. The two drove up the canyon together discussing Log Haven's financial condition. At Log Haven, Rasmussen asked Moore to endorse a check over to Rasmussen. Moore testified that he was very tired from several sleepless days and that the request angered him. Apparently as a result of his anger at being replaced as manager by Rasmussen and his distraught condition from his lack of sleep, Moore shot Rasmussen with a .45-caliber automatic handgun that he had been carrying for several days. Moore left Rasmussen's body and went into the restaurant, to find a chain for use in disposing of the body. When Moore returned, a laundry van was parked outside the restaurant, and the laundryman, Buddy Booth, was looking at Rasmussen's dead body. Moore also shot and killed Booth, loaded the two bodies into the laundry van, drove the van off the driveway, and threw his gun into a sewage sump. He then called the police, who took Moore to the police station for questioning.

As a result of the questioning, the receipt of further information from Log Haven, and because of the spattered blood on Moore's trousers, the police informed Moore that he was a suspect and promptly gave him his *Miranda* rights. When Moore requested the assistance of counsel, interrogation ceased. Moore telephoned his father who could not or would not arrange for counsel. Moore claims that at that point he asked Detective Beckstead to arrange for a public defender. Moore alleges that Beckstead indicated he would arrange for counsel.

Moore was booked for criminal homicide. Although he was aware he had access to a telephone while in a holding cell, he did not attempt to contact counsel, even though he was aware of at least one criminal defense lawyer whom he considered hiring. Moore also talked with pre-trial services personnel who informed him of the legal defender services. Moore did not call the legal defenders. After six hours of confinement, he called Detective Beckstead, who was at Log Haven, to discuss the double homicide. Before giving his statement to Beckstead, Moore was again informed of his *Miranda* rights and asked whether he understood what it meant to waive the right to have an attorney present. When Moore initially stated that he did not understand, Detective Beckstead further explained to Moore his right to counsel, and only then did Moore agree to make a statement to the police without an attorney present. Moore stated that his initial intention was not to cover up the crime, but that he had been scared and had no control over himself. He stated that he was sorry he had wasted the police's time and effort by not confessing earlier, and related the details of the homicides.

I.

Moore argues on appeal that he did not validly waive his right to counsel because he had no opportunity to consult with counsel and that the incriminating statements he made to Detective Beckstead should, therefore, have been excluded from evidence. Specifically, he contends that a valid waiver of the right to counsel cannot be made without having counsel present to advise him.

■ *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plu-

rality opinion); *Edwards v. Arizona*, 451 U.S. 477, 1101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); and *State v. Newton*, Utah, 682 P.2d 295 (1984), hold that an accused's statements made after he has invoked his right to counsel and before counsel is made available to him are admissible if three conditions are satisfied. First, it must be the accused, not the law enforcement officers, who initiates the conversations in which the incriminating statements are made. Second, the prosecution must show, on the motion to suppress, a knowing and intelligent waiver of the right to counsel. Third, the accused's statements must be shown by a preponderance of the evidence to have been voluntarily made. We address these standards seriatim.

■ Moore does not dispute that he initiated the critical conversation about the killings with Detective Beckstead. Indeed, the evidence establishes that Moore asked for Detective Beckstead's telephone number and twice called to arrange for an interview with the detective because he "wanted to tell ... all about it." This was not an invitation to a generalized conversation with respect to something unrelated to the crime charged, such as a "request for a drink of water or a request to use a telephone," requests "so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 103 S.Ct. 2830, 2835 (1983). Rather, the defendant specifically stated his desire to relate the details of his crime.

■ The determination of whether a waiver of the right to counsel was made knowingly and intelligently depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* (citations omitted). The defendant is an intelligent and well-educated person. He graduated from high school, completed two years of college, and rose to a position of high responsibility at his place of employment. On this evidence, and Detective Beckstead's second explanation of

his right to counsel just before Moore confessed, we conclude that the defendant made a knowing and intelligent waiver of the right to counsel. *State v. Newton*, Utah, 682 P.2d 295 (1984).

Moore argues that the third element of the *Bradshaw* test was not satisfied because his statements were not voluntary. He alleges no actual or threatened physical abuse, but he claims that his confession was the result of psychological pressure. Moore contends that there was a purposeful delay in arranging for counsel for him and that he was subjected to conditions and procedures which put psychological pressure on him to confess, which rendered his confession involuntary.

■ The test of whether a confession is voluntary depends upon the totality of the circumstances. A confession cannot "be extracted by threats or violence or obtained by improper influences or promises" and still be deemed to be voluntary. *State v. Watts*, Utah, 639 P.2d 158, 160 (1981). Moore testified that he was at first misled by Detective Beckstead and later was misinformed by pre-trial services about the availability of counsel while he was in jail. If either pre-trial services or Detective Beckstead had prevented the defendant from obtaining counsel in a timely fashion prior to his confession, defendant's right to counsel might have been violated. The State, however, presented evidence contrary to the defendant's on this point, and the record supports the finding that there was no violation of his right to counsel.

■ Moore's second claim, that the conditions and procedures at the county jail were such that his confession was involuntary, is also without merit. Obviously, an accused will likely experience at least some anxiety as a natural incident of being arrested and incarcerated that may affect the accused's psychological condition. But a confession is not involuntary because an accused experiences some anxiety because of his arrest and incarceration.

The record shows that Moore had his clothes taken from him and had a paraffin test made on his right hand. Both procedures were necessary for the investigation of the case. Moore's blood-spattered clothing and the possible gun powder residue on his hand were evidence. However, aside from such circumstances, there must be some physical or psychological force or manipulation that is designed to induce the accused to talk when he would not otherwise have done so. *See, e.g., Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). None has been shown in this case. In *State v. Meinhart,* Utah, 617 P.2d 355, 357 (1980) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)) we stated:

> "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."

The evidence supports a finding that Moore's confession was not the product of duress or coercion, but was rather voluntary.

## II.

Moore next asserts that the trial court erred by failing to dispense with the death qualification on voir dire of the jury. Utah Code Ann., 1953, § 77–35–18(e)(10) provides that jurors may be challenged for cause on the following ground:

> If the offense charged is punishable by death, the entertaining of such conscientious opinions about the death penalty as would preclude the juror from voting to impose the death penalty following conviction, regardless of the facts.

The United States Supreme Court has held that a venireman may be excused for cause if his scruples are such that the juror could never impose the death penalty. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The practice of death-qualifying the jury has been followed in Utah and sustained by this Court. *State v. Norton,* Utah, 675 P.2d 577, 588–89 (1983); *State v. Redford,* 27 Utah 2d 379, 496 P.2d 884 (1972); *State v. Belwood,* 27 Utah 2d 214, 494 P.2d 519 (1972). *Cf. State v. Brown,* Utah, 607 P.2d 261 (1980).

Defendant acknowledges the Supreme Court's opinion in *Witherspoon,* but emphasizes that he is entitled to a neutral jury from a fair cross-section of the community. He points to numerous studies which indicate that death-qualified juries are more inclined to convict than nondeath-qualified juries. The defendant's data may well be correct. However, there is some counterbalancing under Utah law. In *State v. Norton,* Utah, 675 P.2d 577, 589 (1983), we held that a trial judge must also ask prospective jurors whether they would always vote for a death penalty upon a conviction of first degree murder. We realize that the disqualification of such persons does not fully meet defendant's point about conviction-prone jurors, but we think that experience teaches that jurors generally seek to apply the law and to rise above personal inclinations or predispositions. That jurors may have a subconscious predisposition one way or another that cannot be reached by self-conscious effort may well be a truism. But we cannot conclude that a jury of persons who may impose a death sentence, but are not committed in advance to do so, will be less than fair and impartial in determining guilt.

Furthermore, the Legislature has established capital punishment as one of the options in a first degree murder case. Clearly the legislative policy would be undermined if jurors were allowed to sit who by conscience could never impose the death penalty.

The evidence indicates that the trial judge conducted a voir dire examination of each juror individually, asking each juror if he or she had "an attitude or opinion regarding capital punishment." The potential jurors were asked whether they would always vote to impose the death penalty regardless of the facts or whether they

would consider the aggravating and mitigating factors and make a fair and impartial decision. Similarly, each juror was asked whether he would always vote against capital punishment. Thus, the trial judge took appropriate steps to remove both categories of jurors who would refuse to follow the law.

No juror was actually excused for cause either because of scruples for or against the death penalty. Nothing in the record indicates that the jurors were biased in favor of the prosecution or against the appellant. Rather, the evidence indicates that the jury chosen had no conscientious scruples for or against the death penalty which would preclude it from considering the death penalty or influence its determination of guilt or innocence in any manner.

Affirmed.

HALL, C.J., and HOWE, DURHAM and ZIMMERMAN, JJ., concur.