**STATE of Utah, Plaintiff and Respondent,**

v.

**John Charles BOLSINGER, Defendant and Appellant.**

No. 17736.

Supreme Court of Utah.

April 5, 1985.

David L. Wilkinson, A.G., Robert N. Parrish, Asst. A.G., Salt Lake City, for Paintiff and Respondent.

F. John Hill, Salt Lake City, for Defendant and Appellant.

HOWE, Justice:

Defendant appeals from a verdict convicting him of murder in the second degree.

On March 29, 1980, 33-year-old Kaysie Sorensen was found dead by her boyfriend, Mark Anger, in his apartment when he returned from a 24-hour shift as a firefighter. She was lying spread-eagled on the bed, all but her legs covered with a sheet. The cord of a clock radio resting on the bed was loosely tied around her neck. A catalogue advertising sexual paraphernalia and entitled "Romeo ... your Source of Sexual Pleasure" was nearby on the floor. "The Joy of Sex" and "Supersex," two books of explicit sexual literature, were in the nightstand by the bed. The living room seemed to indicate that a burglary had taken place. The contents of Kaysie's purse were scattered on the floor, a lamp was knocked over, and Mr. Anger's stereo was missing. Kaysie had last been seen alive on March 28, 1980, in Bill's Lounge in Magna, where she was a regular customer. She arrived there in a state of intoxication around 8:00 p.m. She sang along with a jukebox, danced by herself on the dance floor and "tried to kiss a lot of guys on the cheek up and down the bar." She finally approached the 23-year-old defendant when he entered the bar around 9:00 p.m., watched him play pool, put her arms around him between pool shots, kissed him on the cheek and finally left with him shortly before 10:00 p.m.

After preliminary investigation, defendant was arrested and booked in the Salt Lake County jail on April 1, 1980, where he made a confession in the early morning hours of April 2. According to the confession and later undisputed testimony at trial, defendant and Kaysie drove to defendant's home, where they picked up a bottle of whiskey and then continued to Mr. Anger's apartment. They played records on the stereo, danced and drank straight from the bottle for about an hour. Both were quite intoxicated. They went to the bedroom, partially undressed, lay down on the bed, and eventually engaged in sexual intercourse with defendant atop Kaysie.

Thereafter, the statements given in defendant's confession and at trial diverged. At trial defendant testified that after about five minutes he stopped for a moment to rest, started to get up, and Kaysie said "no." He rolled off to the side and she rolled over to pick up the clock radio, setting it down next to her. Neither of them commented about the radio. The couple resumed intercourse, defendant felt Kaysie move around, opened his eyes and saw the cord around her neck. They continued intercourse, and defendant opened his eyes again when he heard Kaysie say "pull." At this time she was holding the cord with

her arms extended in a 45-degree upward angle. When questioned why he took hold of the cord, defendant replied, "she asked me to. I heard there was something like that, and I don't know where but I heard something like that." Defendant pulled "like tying your shoes" for about fifteen to twenty seconds, reached a climax and relaxed, still on top of Kaysie, then rolled off to the side. When he looked at her a few moments later, he noticed that Kaysie's face looked strange, not awake or reacting. He became afraid, got up, picked up his clothes, went into the living room, dressed and walked back into the bedroom. Kaysie was still in the same position. Defendant looked at her for a few moments, could not be sure at trial but thought that he put a sheet over her, picked up his bottle, returned to the living room, dumped the contents of her purse and left the apartment with the stereo.

This testimony paralleled the confession in all but three aspects. Defendant there stated that it was he who grabbed the radio and he who wrapped the cord around her neck after intercourse, but while he was still on top of her; that Kaysie "got kinda weirdlike," indignant; and that it just happened. He was not mad, there was no fight, "she just laid [sic] there." The confession ended with the following exchange:

Q. Do you know why it happened?

A. Wish I did.

Q. Have you ever been involved in anything else like this before?

A. Never. Not even close. Never even any, hurt anybody before.

At trial defendant explained that he had lied to the police in his taped confession. He had been told that the scene looked like a rape murder, but that if what he told the police did not happen during intercourse, the charge could be reduced. All he knew at that time was that he wanted to keep himself from being charged with first degree murder and being sentenced to death. He also did not think that anyone would believe the truth.

The State's medical examiner testified that the victim was wearing a vaginal contraceptive at the time of death. Sperm and seminal fluid were present in the vagina. Her alcohol blood level was .22. There was no structural damage to the neck. The hyoid bone and larynx were intact. A light horizontal ligature abrasion, approximately four inches long on the left side and three inches long on the right side, partially encircled the neck. There was no evidence of furrowing or any indication that the cord was ever knotted or in a tied position. Hemorrhages of the capillaries (petechial hemorrhages) above the ligature were located within the conjunctiva of the eyes, the right cheek and the scalp, a typical phenomenon resulting from strangulation by ligature. There was no hemorrhaging below the ligature mark. The medical examiner testified that, in addition to cutting off blood supply to the brain, pressure around the neck, and especially on the right and left carotid[1] sinuses, would slow the heart and respiratory rates, compounding the factors contributing to the fatal episode. He estimated that, with a ligature applied, unconsciousness would result within five to ten seconds. If it were immediately released, breathing would resume naturally. If the pressure were not then released but were to be continued, a victim's life could be saved only if he were resuscitated within thirty seconds to two and one-half minutes after losing consciousness. Pressure applied to the throat of an intoxicated person would produce death more quickly. This testimony was essentially corroborated by an expert witness for the defense. He testified that a third factor hastening death was the weight of defendant on Kaysie's chest, as evidenced by congestion of the blood vessels across the uppermost portion of the chest of the victim. That evidence stands unrebutted by the State. Both medical experts agreed that there was no trauma to the victim's private areas or thighs and no injury or other evidence indicating a struggle between the couple. The

1. From Greek "karoun," to plunge into sleep or stupor; so called because compression of these arteries may cause unconsciousness because of impeded blood flow to the brain.

only other external marks found on the body were three very superficial scratches on the right cheek, between one and two millimeters long, as well as three small bruises, one on the back of the left hand and two on the top of the arch of the right foot.

Kaysie's boyfriend, Mark Anger, testified that Kaysie had a drinking problem, that during her drinking sprees she would be very depressed, that she had been drinking shortly before her death, that "she had to have sex all·the time" and that she had difficulty achieving sexual gratification. He also admitted that he and Kaysie had explored some of the practices described in the literature but never engaged in "anything like that."

The defendant raises several issues on appeal. We have noted them all, but because of our holding conclude that two of them are dispositive.

## I.

■■■ In his first point, defendant contends (1) that the trial court erred in refusing to suppress the taped confession in that the Miranda warnings given to defendant were vitiated by the failure of the police to scrupulously honor those rights and (2) that the defendant did not voluntarily waive his right to counsel or his right to remain silent. On the question of voluntariness, it is both the prerogative and the duty of the trial court to determine whether a defendant's confession should be admitted. *State v. Ricci*, Utah, 655 P.2d 690

(1982). The hearing on defendant's motion to suppress lasted two days. The court heard and considered all the evidence on the question of voluntariness as mandated by *State v. Crank*, 105 Utah 332, 142 P.2d 178 (1943). The court found the confession to have been voluntary, and absent an abuse of discretion that finding will not be overruled. *State v. Watts*, Utah, 639 P.2d 158 (1981); *State v. Shuman*, Utah, 639 P.2d 155 (1981); *State v. Meinhart*, Utah, 617 P.2d 355 (1980).

■■■ On the question of whether the Miranda warnings were vitiated by subsequent police conduct, we concede that the continued request by the police to defendant to tell his side of the story, after defendant repeatedly insisted that he would not make any statement until he had consulted with an attorney, bordered on behavior not sanctioned by constitutional guarantees.[2] However, we find it significant that the defendant was left alone between 6:00 p.m. and 3:00 a.m., when Officer Thompson was summoned at the defendant's request. This fact situation is different from *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *reh'g denied*, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), where police interrogation was again initiated by the police after Edwards had declined to make a statement in the absence of counsel and was told *that he had to*. Under the circumstances here, the trial judge could well have found that defendant initiated the subsequent communications with Thompson and that his state-

**2.** Defendant was arrested at his home by Officer Beckstead at about noon on April 1, 1980, and agreed to go with him to take a polygraph test. He arrived at the Metropolitan Hall of Justice at 1:00 p.m. and waited in the presence of several officers until 2:30 p.m. when the test was finally administered by Officer Elliott. It lasted 1½ hours and indicated that defendant had lied. Defendant at that point requested counsel. Beckstead and Elliott went into the polygraph room to get a statement from defendant. Defendant renewed his request for counsel three times. The officers informed defendant of the degrees of homicide and penalties and possible charges against him and repeated that information by telephone to his mother in his presence. Apparently attempts to contact a lawyer were

made after 5:00 p.m. but discontinued when one lawyer could not be contacted at his office. Defendant was finally formally arrested and booked into jail by Officer Thompson at around 6:00 p.m. Thompson told him once more "that he could possibly be charged with a capital offense which would be either life imprisonment or the firing squad." He was asked again to "talk about it," and again he requested counsel. Thompson left his card with defendant and told him and the desk sergeant that he could be reached at any hour. At midnight defendant asked the jailer to contact Thompson, who responded at 3:00 a.m., six hours before Thompson had told defendant that formal charges against him would be filed.

ments amounted to a valid waiver of his fundamental right to counsel and were therefore admissible at trial. We affirm the denial of the motion to suppress.

## II.

■ Defendant next contends that the evidence was insufficient to convict him of murder in the second degree under any of the three theories advanced by the State. We shall examine the first two theories together, *viz.*, (1) intentionally or knowingly causing the death of another, U.C.A., § 76–5–203(1)(a) (1978), or (2) causing the death of another while committing an act clearly dangerous to human life but intending to cause only serious bodily injury, U.C.A., § 76–5–203(1)(b) (1978). We review the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the jury verdict. *State v. Johnson*, Utah, 663 P.2d 48 (1983), and cases cited therein.

■ According to the State, defendant admitted that when Kaysie acted indignantly, he grabbed the clock radio, wrapped the cord around her neck and "just started pullin' on it." From that admission, the State would infer that defendant intended to kill, or at least cause serious bodily injury to, Kaysie. We have carefully read and analyzed the confession and find that it is incomplete and vague as to the defendant's state of mind. He did not say or even imply in the confession that he put the cord around her neck *because* she looked indignantly at him. Indeed, he negates that inference by saying that he was not mad and that she did not poke fun at him or talk at all. His questioner did not ask him why he reached for the cord and placed it around her neck. The defendant simply said that he did it. His confession offers no clue or hint as to his mens rea. His questioner totally failed to explore that subject. Nothing in the exchange between defendant and Kaysie can form a basis from which an inference to kill or harm can be drawn. During the entire evening and night they were together, no anger was expressed, no threats were made, and no struggle or violence occurred. He stated he pulled on the cord for what "seemed like a second." The incident was part of a consensual act of intercourse between two intoxicated persons in an atmosphere of tranquility. We thus conclude that the confession does not support an inference beyond a reasonable doubt that the defendant intentionally or knowingly killed Kaysie or intended to cause her serious bodily injury.

One further argument made by the State is not supported by the record. According to the State, the medical examiner testified that continuous pressure had to be applied to the ligature for three to five minutes to cause death. That is not an accurate statement of his testimony. Instead, the record reflects that after clarification on cross-examination, he conceded that the ligature here could have been applied for as short a time as thirty seconds. His reference to the three- to five-minute period concerned the time of unconsciousness and deprivation of oxygen to the brain, after which artificial resuscitation would likely be unsuccessful. The State's version misstates the substance of the examiner's testimony.

We next focus on the State's third theory. Under section 76–5–203(1), criminal homicide constitutes murder in the second degree if the actor:

(c) Acting under circumstances evidencing a depraved indifference to human life, he [sic] engaged in conduct which creates a grave risk of death to another and thereby causes the death of another.

Section 76–1–501(1) presumes a defendant to be innocent until each element of the offense charged against him is proved beyond a reasonable doubt; the requisite actus reus and mens rea set out in section 76–1–501(2) constitute the elements of the offense as follows:

(a) The conduct, attendant circumstances, or results of conduct prescribed, prohibited, or forbidden in the definition of the offense;

(b) The culpable mental state required.

We recently had an opportunity to clarify the apparent hiatus left by the legislative

elimination in 1979 of the reckless state of mind previously required to find depraved indifference. In *State v. Fontana*, Utah, 680 P.2d 1042 (1984), we held the proper subjective mental state under that subsection to be "knowing," one of four possible categories of mens rea required to prove criminal responsibility under section 76–2–101(1).[3]

Section 76–2–103 states:

A person engages in conduct:

. . . .

(2) Knowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Correlating the conduct, circumstances, and result required under the depraved indifference statute and the mens rea of knowledge as promulgated in *State v. Fontana, supra,* we conclude that the following elements had to be present to properly convict the defendant under the State's third theory:

1. The defendant engaged in conduct which created a grave risk of death to another and that conduct resulted in the death of another—the actus reus.
2. The defendant knew that his conduct or the circumstances surrounding his conduct created a grave risk of death to another—the mens rea.
3. Defendant acted under circumstances evidencing a depraved indifference to human life—a qualitative judgment to be made by the jury in determining the extent of the defendant's conduct. It is not a description of the mens rea involved in the commission of the crime, but an evaluation of the actus reus.

*See People v. LeGrand,* 61 A.D.2d 815, 402 N.Y.S.2d 209, *cert. denied,* 439 U.S. 835, 99 S.Ct. 117, 58 L.Ed.2d 130 (1978); *People v.*

*Register,* 90 A.D.2d 972, 456 N.Y.S.2d 562 (1982).

There is no question that defendant engaged in conduct creating a grave risk of death and actually resulting in death. It is the degree of culpability as well as the evaluation of the conduct that we question here. As enunciated under *State v. Fontana,* knowledge of one's conduct or the circumstances surrounding the conduct is the cognizance that the conduct or the circumstances surrounding it create a life-endangering risk to another. *Accord People v. Marcy,* Colo., 628 P.2d 69 (1981) (knowing conduct under Colorado Depraved Indifference Statute).

 We begin with the requisite mens rea. At trial the State stressed the discrepancy between the two versions of the defendant's story. That discrepancy is deceiving at best. What emerges instead is an identical mens rea under both versions. Both in the confession and at trial, the defendant denied having intended any harm. No words, angry or otherwise, were exchanged by the couple. Defendant was not mad. There was no struggle. He was on top of the victim when he pulled the cord for what may have been no more than thirty seconds. The physical evidence is undisputed with respect to the absence of a struggle and to the position of the defendant when he pulled on the cord. Given those facts, reasonable minds must perforce entertain reasonable doubt that there was that degree of awareness with respect to the defendant's conduct and surrounding circumstances to impute to him the knowledge that his conduct created a grave risk of killing Kaysie and that he possessed the medical knowledge that compounding factors existed which would hasten her death. There is, however, sufficient evidence that the defendant was aware of, but consciously disregarded, a substantial and unjustifiable risk that placing and/or pulling a cord around the victim's neck would result in her death. That risk was of such a nature and degree that its disregard constituted a

---

**3.** The 1983 Legislature expanded criminal responsibility to include "a mental state otherwise specified in the statute defining the offense...." U.C.A., 1953, § 76–2–101(1) (Supp.1983).

gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from defendant's standpoint. Such conduct is "reckless" under section 76–2–103(3).

▪ In evaluating the defendant's conduct, reasonable minds must be free from reasonable doubt that the defendant was guilty of depraved indifference to the grave risk of death created by his conduct. To constitute depraved indifference, the act must be one "which has been rather well understood at common law to involve something more serious than mere recklessness alone which has had an incidental tragic result." *People v. Poplis*, 30 N.Y.2d 85, 89, 30 N.Y.S.2d 365, 366, 281 N.E.2d 167, 168 (1972). There must be a knowing doing of an uncalled-for act in callous disregard of its likely harmful effect on a victim, which is so heinous as to be equivalent to a "specific intent" to kill. *Neitzel v. State*, Alaska App., 655 P.2d 325 (1982); *People v. France*, 57 A.D.2d 432, 394 N.Y.S.2d 891 (1977). Depraved indifference to human life is characterized by unmitigated wickedness, extreme inhumanity or acts exhibiting a high degree of wantonness. *People v. Northrup*, 83 A.D.2d 737, 442 N.Y.S.2d 658 (1981).

In *Neitzel, supra,* the court enumerated four determining factors a jury should be asked when it evaluates conduct resulting in death and alleged to be depraved indifference: (1) the utility of the defendant's conduct, (2) the magnitude of the risk, (3) the defendant's knowledge of the risk, and (4) any precautions taken by the defendant to minimize that risk. In differentiating reckless[4] conduct amounting to depraved indifference from conduct amounting to reckless manslaughter, the jury is asked to pay particular attention to the social utility of the defendant's conduct and the precautions he takes to minimize the apparent risks. *Id.* at 336–337.

Much as the social utility in this case is lacking, it must nonetheless be assessed against the backdrop of a delicate situation which involved only the defendant in the consensual act of intercourse with a sexually sophisticated woman ten years his senior. The physical evidence present in the bedroom, the testimony at trial attesting to her lack of sexual fulfillment and the admission by her lover of two years (a witness for the State) that he and the victim had explored some of the suggestions found in the manuals do not attest to the depraved act of a murderer. Both medical experts were in agreement that the strangulation was accomplished with little force and was enhanced by at least one other factor, the high alcohol content in the blood of the victim. Both medical experts agreed that the ligature marks were light, resulting from momentary pressure. That physical evidence alone confirms the defendant's attempt—albeit ineffective—to take precautions to minimize the risk of harm, and it negates the existence of a depraved indifference to human life. In sharp contrast to defendant's conduct here, conduct in the following cases was properly held to constitute depraved indifference: *Neitzel, supra* (defendant fired several shots directly at girl friend while she sat on the ground. Some struck the ground within an inch of the victim before the fatal shot entered her head); *People v. Lilly*, 71 A.D.2d 393, 422 N.Y.S.2d 976 (1979) (defendant inflicted vicious and brutal injuries on 6½-pound baby girl over period of one month and sought no medical attention to ease substantial pain); *People v. LeGrand*, 61 A.D.2d 815, 402 N.Y.S.2d 209 (1978), *cert. denied, LeGrand v. New York*, 439 U.S. 835, 99 S.Ct. 117, 58 L.Ed.2d 130 (1978) (defendant beat former wife to death, dragged her body down two flights of stairs, chopped her up and stuffed her into plastic bags for easier disposal); *State v. Nicholson*, Utah, 585 P.2d 60 (1978) (defendant neglected and mistreated small son for a period in excess of five months. Victim was found dead of malnutrition and dehydration in garbage, spoiled food and human feces reaching a depth of three feet in some places).

The evidence here simply does not support a finding of depravity in the conduct

---

4. The requisite mens rea under the Alaska Depraved Indifference Statute.

of the defendant that *caused the death of Kaysie.* The jury may well have been swayed by the reprehensible conduct of the defendant subsequent to her death. But that conduct is not before us for review. The evidence is undisputed that Kaysie was dead when defendant rose from the bed. He himself covered her face with a sheet, a universal gesture acknowledging death. At that moment the conduct which subjected him to a charge of criminal homicide came to an end.

We hold that there is insufficient evidence to support a conviction for murder in the second degree as charged, but that there is sufficient evidence to support a conviction for the included offense of manslaughter. The jury was given an instruction on manslaughter under section 76-5-205(1)(a) and (c). The defendant requested an additional instruction on that offense, which was refused. The jury necessarily found every fact required for conviction of that included offense. The defendant concedes that his conduct created a grave risk of harm which necessarily includes "recklessness," which is the requisite state of mind for manslaughter. Defendant has thus impliedly consented to the reduction. Accordingly, by authority of section 76-1-402(5), we remand the case to the trial court with directions to set aside the verdict and to enter a judgment of conviction for manslaughter without the necessity of a new trial and to sentence the defendant accordingly. *See State v. Bindrup,* Utah, 655 P.2d 674 (1982).

DURHAM, J., concurs.

STEWART, Justice (concurring and dissenting):

I concur in that part of the plurality opinion which holds that the second degree murder conviction must be set aside be-

cause the State failed to prove the requisite mens rea.

## I.

I dissent, however, from the plurality's disposition of the case. Since the State failed to prove a necessary element of the crime charged, the appropriate disposition of the case is to reverse the conviction and remand to the trial court to enter a judgment of acquittal. *See* U.C.A., 1953, § 76-1-403(2); *State v. Petree,* Utah, 659 P.2d 443 (1983). Instead, however, the plurality—on its own initiative and its own factual determination—holds the defendant guilty of manslaughter and remands to the trial court to enter a judgment of conviction for manslaughter. The plurality relies on § 76-1-402(5) [1] as authority for that action, but it misreads that section. This Court is authorized by the statute to reduce the degree of conviction only if (1) a reduction is sought by the defendant and (2) every fact required for conviction of an "included offense" was found by the jury. *Id.* In the first place, the defendant has not sought reduction of his conviction to manslaughter. In the second place, the jury made no finding on the requisite mens rea for manslaughter. Therefore, the statute is not applicable. Furthermore, the plurality's disposition violates the defendant's right to trial by jury and his right not to be twice placed in jeopardy for the same crime. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *State v. Musselman,* Utah, 667 P.2d 1061 (1983); *State v. Murphy,* Utah, 617 P.2d 399 (1980). *See also State v. Lamorie,* Utah, 610 P.2d 342, 347 (1980) (Stewart, J., concurring).

---

1. That section provides:
 If the district court on motion after verdict or judgment, or an appellate court on appeal or certiorari, shall determine that there is insufficient evidence to support a conviction for the offense charged but that there is sufficient evidence to support a conviction for an included offense and the trier of fact neces-

 sarily found every fact required for conviction of that included offense, the verdict or judgment of conviction may be set aside or reversed and a judgment of conviction entered for the included offense, without necessity of a new trial, if such relief is sought by the defendant.

## II.

I also dissent from the part of the plurality's view that the defendant's right to counsel under the Sixth Amendment, as interpreted by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), was not violated.

*Miranda v. Arizona, supra,* held that protection of the Fifth Amendment privilege against compelled self-incrimination entitles a suspect to have counsel present at any custodial interrogation pursuant to the Sixth Amendment and to be informed of that right. *Id.* 384 U.S. at 469–72, 86 S.Ct. at 1625–26. The fundamental objective of the rule is to ensure that the truth-seeking processes of the criminal law are neither corroded nor corrupted by subjecting a suspect to coercive influences, whether physical or psychological. In *Miranda,* the Court stated:

> That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. The presence of an attorney, and the warnings delivered to the individual, enable the defendant under otherwise compelling circumstances to tell his story without fear, effectively, and in a way that eliminates the evils in the interrogation process. Without the protections flowing from adequate warnings and the rights of counsel, "all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police."

*Id.* at 466, 86 S.Ct. at 1623 (quoting *Mapp v. Ohio,* 367 U.S. 643, 685, 81 S.Ct. 1684, 1707, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting)). In *Edwards v. Arizona,* 451 U.S. at 485, 101 S.Ct. at 1885, the Court stated that "Miranda itself indicated that the assertion of the right to counsel was a significant event *and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'*" (Quoting *Miranda v. Arizona,* 384 U.S. at 474, 86 S.Ct. at 1627) (emphasis added).

An accused may, of course, waive his right to counsel and his privilege against self-incrimination and voluntarily confess. The law has no interest in preventing a person from willingly, intelligently, and knowingly waiving his constitutional rights under the Fifth and Sixth Amendments. However, once one who is in custody invokes his right to the assistance of counsel, interrogation must then stop and the police may not resume interrogation of the suspect unless the suspect himself initiates further communication with the police. *Wyrick v. Fields,* 459 U.S. 42, 53, 103 S.Ct. 394, 399, 74 L.Ed.2d 214 (1982).

In determining whether a suspect has waived his right to counsel before making an incriminating statement, a strict standard must be met and the burden is on the State to prove the waiver. *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). The reasons for imposing a strict standard on the State for proving a waiver are explained in *Schneckloth v. Bustamonte,* 412 U.S. 218, 241, 93 S.Ct. 2041, 2055, 36 L.Ed.2d 854 (1973):

> A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial. Any trial conducted in derogation of that model leaves open the possibility that the trial reached an unfair result precisely because all the protections specified in the Constitution were not provided. A prime example is the right to counsel. For without that right, a wholly innocent accused faces the real and substantial danger that simply because of his lack of legal expertise he may be convicted. As Mr. Justice Harlan once wrote: "The sound reason why [the right to counsel] is so freely extended for a criminal trial

is the severe injustice risked by confronting an untrained defendant with a range of technical points of law, evidence, and tactics familiar to the prosecutor but not to himself."

(Quoting *Miranda v. Arizona,* 384 U.S. 436, 514, 86 S.Ct. 1602, 1648, 16 L.Ed.2d 694 (1966) (Harlan, J., dissenting).)

The critical issue in the instant case is whether the defendant waived his right to counsel.[2] That question is antecedent to the question of whether the defendant's confession was voluntary. Concededly, the defendant was given a *Miranda* warning before he gave his confession at 3 o'clock in the morning.

The test for determining whether a suspect has voluntarily waived his privilege against self-incrimination under the Fifth Amendment is different from the test for determining whether he has waived his right to counsel under the Sixth Amendment. With respect to the Fifth Amendment, the State must prove that the confession was the "product of an essentially free and unconstrained choice by its maker[.] If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Schneckloth v. Bustamonte,* 412 U.S. at 225–26, 93 S.Ct. at 2046–47 (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961)).

Waiver of the Sixth Amendment right to counsel does not require a showing of absence of coercion, although the existence of coercion would surely vitiate any semblance of a waiver. What is required is that the State prove that the accused intelligently and knowingly relinquished his right to be questioned in the presence of counsel. *State v. Moore,* Utah, 697 P.2d 233 (1985); *State v. Newton,* Utah, 682 P.2d 295 (1984). In *Wyrick v. Fields,* 459 U.S. 42, 54, 103 S.Ct. 394, 399, 74 L.Ed.2d 214 (1982), the Court stated that the State must prove an intentional abandonment or

relinquishment of the right to have counsel present. It is because of the importance of the presence of defense counsel in protecting the truth-seeking procedures of the criminal process that the standard for determining whether a suspect has waived counsel is strict and the "courts indulge in every reasonable presumption against waiver." *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977).

In *Brewer* the Court held that the police violated the defendant's right to counsel on facts much less compelling than those in this case. In *Brewer* a police officer deliberately and purposely induced an accused, in the absence of his attorney, to volunteer incriminating information that pertained to the crime under investigation. The officer engaged in no direct interrogation of the accused. Rather, he engaged in a lengthy monologue designed to play upon the accused's religious convictions and his psychological vulnerability arising from his mental abnormalities. The Court held that the monologue delivered during a long car ride when the confession was also given, was "tantamount to interrogation." 430 U.S. at 400, 97 S.Ct. at 1240.

The Iowa trial court in *Brewer* ruled, on grounds that are similar to those argued by the plurality here, that the defendant had waived his right to counsel by volunteering the information:

> The time element involved on the trip, the general circumstances of it, and more importantly the absence on the Defendant's part of any assertion of his right or desire not to give information absent the presence of his attorney, are the main foundations for the Court's conclusion that he voluntarily waived such right.

*Id.* at 401, 97 S.Ct. at 1240. The Iowa Supreme Court, applied the "totality of the circumstances test"—the test applied by both the trial court and the plurality in this case—and sustained the trial court. *Id.* at 402, 97 S.Ct. at 1241. A federal district

---

**2.** There is no question that the defendant was in custody at least from the time he completed the

polygraph test. *See Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

court, in a habeas corpus proceeding, held that the defendant had not waived his right to counsel. The court held that the detective's speech to the defendant constituted an effective psychological manipulation to get the accused to talk by playing upon his deeply held religious views and his mental impairment. The detective's purpose to induce an apparently volunteered incriminating statement was successful. *Id.* at 402–03, 97 S.Ct. at 1241–42.

The United States Supreme Court affirmed the finding of nonwaiver, stating:

> We have said that the right to counsel does not depend upon a request by the defendant, *Carnley v. Cochran*, 369 U.S. 506, 513 [82 S.Ct. 884, 888, 8 L.Ed.2d 70,] *cf. Miranda v. Arizona*, 384 U.S., at 471 [86 S.Ct. at 1626,] and that courts indulge in every reasonable presumption against waiver, *e.g., Brookhart v. Janis, supra*, at 4; *Glasser v. United States*, 315 U.S. 60, 70 [62 S.Ct. 457, 464, 86 L.Ed. 680.] This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings. *Schneckloth v. Bustamonte*, 412 U.S. 218, 238–240 [93 S.Ct. 2041, 2053, 2054, 36 L.Ed.2d 854]; *United States v. Wade*, 388 U.S., at 237 [, 87 S.Ct. at 1937.]

430 U.S. at 404, 97 S.Ct. at 1242.

In this case, prior to giving his confession, the defendant had consistently invoked his right to counsel on numerous occasions when asked to give a statement. His very first invocation of the right to counsel should have stopped all further interrogation. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Instead, in clear violation of the law of the land, the police continued pressuring the defendant for a confession. The police conduct did not "border" on illegality, as the plurality would have it; the conduct was just flatly illegal. Indeed, the pressure applied to the defendant to confess in the absence of counsel was far greater than in *Brewer*. Bolsinger stated time and again after he was informed that he had failed a polygraph test that he

would not give a statement without the assistance of counsel. The officers working on the case simply ignored their well-established duty under the law of the land to immediately stop questioning and importuning the accused after he had invoked his constitutional right. Instead of honoring the defendant's rights, the officers relentlessly persisted in attempting to obtain a confession. For example, Detective Elliott testified that Detective Beckstead had stated to the defendant something to the effect of "let's talk about it, John. We're trying to get you an attorney. Something to this effect. And I can't, you know—again I don't think that it was an interrogation type conversation. It was, you know, let's talk about it. We're trying to get an attorney for you." Detective Thompson testified: "I asked him to talk to me about it.... I wanted to ask him the question and see what he would tell me." And again, "John, you know you was in that house and I know you was in that house. Why don't you tell me about it?" These are but a few of the examples of the continued badgering of the defendant by the police after he had asked for the assistance of counsel.

The police increased the pressure by making the threat that the defendant might be charged with first degree murder unless he talked. That point was vivified and pounded home by a verbal, detailed description of the manner of executing a person by a firing squad, i.e., the strapping of the condemned person to a chair; the placing of a hood over his head; and the calling out of the words "ready, aim, fire," which would be the last words the condemned, i.e. Bolsinger, would ever hear. In addition, the defendant was held without food during the entire time he was in custody and until sometime after he gave his statement.

The plurality argues that the lapse of time between these communications and his confession was sufficient to purge the confession of the illegal conduct of the police. The position is untenable. First, the defendant was told when he was booked that

evening that he had until 8 o'clock the next morning to confess. There was no reason for the police to impose that deadline except that they knew Bolsinger would not be able to talk to an attorney during that time and would be functioning under the threat of a first degree murder charge. Second, the defendant was placed in an area in the jail called the five-cell area or the "Chinese hole"—an area subsequently held to be violative of the cruel and unusual punishment provision of the United States Constitution by the United States District Court for the District of Utah. The reason given by Officer Thompson for placing the defendant in the "Chinese hole" was that the defendant was "extremely depressed and suicidal." However, no mental health officer visited the defendant after he was jailed. It was in that area that prisoners sometimes threw food, feces, and urine at each other and flooded the floor by stopping up toilets so that the mattresses which lay on the floor in the various cells became soaked. The record does not indicate that the defendant was subjected to that particular abuse, but he was placed in a cell next to a person who had such a severe mental problem that he engaged in extended bouts of screaming during the night.

Third, it is clear that Detective Thompson anticipated that Bolsinger would break and give a statement. When Thompson delivered Bolsinger to the jailer, Thompson stated that he could be reached at any time during the night, even at home after his shift ended, if Bolsinger requested to talk to Thompson. The invitation to interrupt an officer at home during his off-duty hours under such circumstances was unusual. Thompson even handed the defendant his personal card with Thompson's name on it before Thompson left the jail. When Bolsinger refused to accept the card, Thompson left it on the bars of the jail so that it would be accessible to the defendant. Later that night, Bolsinger asked that Detective Thompson be summoned and at 3:00 a.m. gave a confession after he had been told again of his oft-violated *Miranda* rights.

Thus, in the wake of (1) the repeated refusals by the defendant to talk without the assistance of an attorney, (2) the deprivation of food, (3) the badgering by the police throughout the day for a confession, (4) the graphic description of the details of an execution by a firing squad, (5) the threat of a first degree murder charge if he did not confess, and (6) the intimidation of being jailed in an area judicially determined to have constituted cruel and unusual punishment, the defendant finally relented and made a self-incriminating statement. All this goes far beyond the "anxiety as a natural incident of being arrested and incarcerated" which was found not to be coercive in *State v. Moore*, Utah, 697 P.2d 233 (1985).

Clearly the police strategy worked—it produced a statement without counsel present to protect the defendant's interests. Obviously the defendant was not physically abused. Nor need he have been. The art of inducing confessions by psychological manipulation and pressure is highly developed in this day and age. In a legal and a practical sense, the statement was the product of effective psychological duress, one of the very evils which *Miranda* was designed to prevent. In a narrow technical sense it can be said that the defendant "initiated" the communication with the police, *see Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), but in a realistic sense, it is a mockery of *Miranda* to say that the defendant waived his right to counsel and voluntarily gave the confession on his own impulse. Indeed, Detective Thompson's phrasing of his question on waiver at the beginning of Bolsinger's confession was so artfully and deftly phrased as to itself belie a valid waiver. He asked: "O.k., John, have I or has anyone else threatened you, or promised you anything *right now*?" (Emphasis added.) In truth, he had been threatened. In all events, the time lapse did nothing to attenuate the illegal police conduct. This case demonstrates a far more serious violation of *Miranda* than existed in *Brewer v. Williams, supra,* where the Court quoted with approval the district court's conclusion

that " 'the use of psychology ...' " was plainly " 'to elicit incriminating statements' " in violation of *Miranda.* 430 U.S. at 403, 97 S.Ct. at 1241.

In sum, I cannot agree with the plurality opinion that there was a valid waiver or that the confession was voluntary. Both issues, in my judgment, require a reversal of the confession and a new trial with a suppression of the confession.

Perhaps the police were well intentioned in this case. Putting the case in the best light from their perspective, the police were attempting to determine what the defendant's state of mind was at the time the victim died. But that view of the case cannot change the result. The defendant was over-matched by the police. He needed an attorney to give him a fair explanation of the law and to protect his constitutional rights.

In any event, good intentions do not justify denying a person those rights established by the Constitution of the United States and the Constitution of this state. Denial of one's constitutional rights, even though by well-intentioned persons sworn to uphold the Constitution, may be as damaging to our institutions as the denial of those rights by those who have illicit intentions.

### III.

The view I have of this case leaves me in a dilemma as to its proper disposition. If the *Miranda* issue were the only issue in the case, I would have to vote to retry the case. In addition to my view of the *Miranda* issue, I concur with the plurality opinion that the evidence is insufficient to support a conviction of second degree murder. The result of this holding should be the discharge of the defendant because a retrial would violate both section 76–1–403(2) and the defendant's Fifth Amendment double jeopardy right. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

The plurality errs, I submit, in directing a judgment of conviction for manslaughter.

Logically, my position would prevent me from joining the plurality in ordering a judgment of conviction for manslaughter. However, I cannot agree with the disposition that would be required by Chief Justice Hall's dissent, for obvious reasons. If, however, I simply vote for either one of the dispositions of the case required by my opinion, i.e., discharge or a reversal and remand for new trial, there would not be a majority of the Court for any one disposition and the judgment of conviction of second degree murder would, therefore, have to be affirmed. But that, in effect, would be the result which only one member of the Court would reach even though three members of the Court would at least set aside the second degree murder conviction. Calling a district court judge to sit as a fifth member of the Court would not likely make any difference in the ultimate resolution of this case, since a vote either for Chief Justice Hall's opinion or for my opinion would leave the Court without a majority for the proper disposition and an automatic affirmance. If the district judge voted for the plurality position, that would, of course, resolve the difficulty. I opt for the alternative which disposes of the case in the manner that comes closest to the views of three members of the Court. I therefore, with strong reluctance, concur in the reversal of the second degree murder conviction and remand for the purpose of entering a judgment of conviction for manslaughter.

HALL, Chief Justice (dissenting):

I do not join the opinion of the Court because it violates the cardinal rule of appellate review that precludes this Court from substituting its judgment for that of the jury on issues of fact.[1]

When faced with a challenge to the sufficiency of the evidence, this Court is bound by the following standard of review:

---

1. *State v. Lamm,* Utah, 606 P.2d 229, 231 (1980).

This Court will not lightly overturn the findings of a jury. We must view the evidence properly presented at trial in the light most favorable to the jury's verdict, and will only interfere when the evidence is so lacking and insubstantial that a reasonable man could not possibly have reached a verdict beyond a reasonable doubt. We also view in a light most favorable to the jury's verdict those facts which can be reasonably inferred from the evidence presented to it. "Thus, intent to commit [a crime] ... may be found from proof of facts from which it reasonably could be believed that such was the defendant's intent." [2]

Thus, this Court has the prerogative to determine the sufficiency of the evidence, but it must view the evidence and all reasonable inferences to be drawn from it in a light most favorable to the jury verdict.[3] We are therefore precluded from assuming the role of fact finder or from surveying the evidence and drawing independent conclusions as to its weight, sufficiency and effect.

The facts of this case, when viewed in a light most favorable to the jury verdict, adequately support defendant's conviction of second degree murder.

Defendant admits that he caused the death of Kaysie Sorensen by strangulation. During his initial interrogation by investigating officers prior to his arrest, defendant lied about his involvement in the death of Sorensen, claiming that he simply dropped her off at Mark Anger's apartment without going in. Following his arrest, three days after the killing, defendant made an oral statement that was recorded and thereafter reduced to writing. The statement recites that defendant took Sorensen to Anger's apartment where they listened to music and danced and that each consumed a sufficient amount of whiskey to inebriate them. In his words, he became "pretty high" and Sorensen became "intoxi-cated." Thereafter, they engaged in a single act of intercourse lasting a "half hour maybe. Maybe less ... when we got done she got kinda weird like. I ... uh, indignant, I don't know what the word is." Defendant then pulled the radio cord from the wall and wrapped it around Sorensen's neck once. When asked if Sorensen did anything, he responded: "Nothin' ... she just laid there ... she wasn't really all the way passed out but she was more or less, I guess. [I] just started pullin' on it ... it only seemed like just a second. And then it was over." In response to a question whether defendant thought Sorensen knew what he was doing when he put the electrical cord around her neck, he stated: "I hope not. I don't know. I just hope not." When asked if she fought back, he responded: "No." Defendant then emptied Sorensen's purse on the floor, but found no money; pulled a sheet over her head; stole a stereo set and left the premises.

Defendant's testimony at trial, nearly a year later, materially contradicted his prior written statement in several respects. He testified that they engaged in sexual intercourse about five minutes without climaxing. He stopped to rest, and Sorensen asked him not to stop. She rolled over and picked up the radio and set it down next to her, and they again engaged in intercourse. He opened his eyes and Sorensen had the cord around her neck. She was holding the cord and said, "Pull." While lying on top of Sorensen, he took the cord in his hands, pulled it tight "like tying your shoes" for a period of "fifteen-twenty seconds," all the while continuing the act of intercourse from which he climaxed. This he supposedly accomplished while deprived of the leverage of his arms and hands that were otherwise utilized in pulling on the cord. After climaxing, he relaxed and remained lying atop Sorensen for about a minute. He then rolled off, saw a "strange, weird" look on Sorensen's face, became scared, emptied her purse, took the stereo and left.

---

**2.** *State v. McCardell,* Utah, 652 P.2d 942, 945 (1982) (citations omitted). *See also State v. Romero,* Utah, 554 P.2d 216, 218 (1976); *State v. Lamm, supra* note 1, at 231.

**3.** *Id.*

Defendant further testified that he lied in his prior written statement in order to avoid the death penalty for rape-murder, he being of the opinion that the truth was so bizarre that it was unbelievable.

An autopsy was performed by the state medical examiner. He testified that he found ligature abrasions encircling the victim's neck, scratches on her right cheek consistent with fingernail scratches, bruises on the back of the left hand and top of the right foot, and hemorrhages in the skin around the eyes, chin and in front of the right ear. His expert opinion was that the cause of death was strangulation by ligature.

The medical examiner described the process of ligature strangulation, explaining that application of pressure cuts off blood to the brain, closes the airways to the lungs, and slows the cardiovascular and respiratory systems. He testified that significant pressure on the ligature would have to be applied continuously for a minimum of 30 seconds to 2½ minutes to cause death if there was no attempt to resuscitate the victim. Unconsciousness would occur 5 to 10 seconds after pressure was applied, and the victim's natural reaction would be to struggle, even after becoming unconscious. He stated that the ligature was applied only once to the victim's neck. He further testified that it is impossible for a person to strangle himself with a ligature because unconsciousness would result before enough pressure to cause death could be exerted. He classified the manner of death as a homicide.

The chief medical examiner of San Francisco County, California, testified on behalf of the defendant. The examiner represented himself as having acquired an expertise in the area of asphyxia during sexual practice, advising that restricting the flow of oxygen and blood to the brain as a means of sexual gratification was not uncommon in California, particularly in the area of San Francisco. He considered the autopsy photographs and the facts as related by the defendant and concluded that Sorensen was accidentally strangled during inter-

course. He testified that the amount of pressure applied to Sorensen's neck by use of the cord was not great, but also acknowledged that the degree of pressure applied was not indicative of whether the killing was accidental or intentional. He also testified that the act of placing a ligature around the neck is intentional and that it always poses a danger to life, particularly so when the victim is intoxicated. Sorensen had a blood-alcohol level of .22% at the time of the autopsy.

The factual issue thus presented to the jury for its determination was concise and unambiguous. Did the defendant kill Sorensen intentionally or accidentally? Wherein did the truth lie between defendant's two conflicting accounts of the death?

As was its prerogative as fact finder, the jury chose to accept as truth defendant's initial written statement that clearly depicted an intentional act on his part that caused the death of Sorensen. That statement, coupled with the totality of the evidence, including the testimony of the Utah state medical examiner, the autopsy, and the evidence at the scene of the crime, is wholly consistent with an intentional killing and adequately supports the jury verdict.

The fact that the two medical experts had differing opinions as to whether death was caused intentionally is commonplace and of no particular significance. Jurors need only consider the opinions of experts and weigh the reasons, if any, given for them. However, they are not bound by such opinions. They may give them the weight they deem them to be entitled to and may reject them entirely if, in their judgment, the reasons given for them are unsound. The jury appropriately was so instructed in this case.

In any event, under the facts peculiar to this case, it was only the defendant who knew the true circumstances that caused the death of Sorensen. Again, it was the prerogative of the jury, and not this Court, to carefully and conscientiously consider and compare all of the testimony and all of the facts and circumstances having a bearing on the issues and to determine from

them what the facts were. The jury was not bound to believe all of the testimony unless it was reasonable and convincing in light of all of the facts and circumstances. Furthermore, since the defendant was known to have made false statements on one occasion and at trial he professed to have lied about the content of his prior written statement, his trial testimony was certainly suspect. Under those circumstances, the jurors were entitled to disregard the whole of the defendant's testimony given at trial or give it only the weight they deemed it was entitled to.

The jury clearly chose to accept defendant's version of the facts of death as set forth in his written statement as being the most trustworthy. That statement is adequately supported by the totality of the evidence, and this Court should not be disposed to conclude otherwise.

I would affirm the conviction and judgment of the trial court.

ZIMMERMAN, J., does not participate herein.