Bellacosa, J.
(dissenting). I vote to reverse this conviction of a 15-year-old person for the highest degree of criminal homicidal responsibility — depraved indifference murder. The evidence adduced, the statutory scheme under which defendant was charged, and the legislative intent behind it do not support the disproportionate level of maximum blameworthiness imposed here. Moreover, this result finalizes the obliteration of the classical demarcation between murder and manslaughter in this State, not only for juvenile offenders but also for all adult accuseds. As former Chief Judge Breitel so trenchantly observed with respect to an analogous statutory scheme and concept: "[T]he appropriate use of affirmative defenses enlarges the ameliorative aspects of a statutory scheme for the punishment of crime, rather than the other way around — a shift from primitive mechanical classifications based on the bare antisocial act and its consequences, rather than on the nature of the offender and the conditions which produce some degree of excuse for his conduct, the mark of an advanced criminology” (see, People v Patterson, 39 NY2d 288, 306-307 [Breitel, Ch. J., concurring (emphasis added)], affd 432 US 197).
From common-law times to modern penal code days, the tragic incident at the heart of this case has qualified as the paradigmatic manslaughter with recklessness as the culpable mental state or mens rea. Indeed, until recently, persons under 16 years of age in this State were legal infants incapable of being convicted of any crime as an adult, no less of the prime, most heinous crime punishable under our law — murder. This case represents an enormous penological regression by combining the juvenile offender exception with the depraved indifference homicide exception and giving birth to this routinized homogeneous murder category.
One of the three definitions of murder in this State is recklessly engaging in conduct which creates a grave risk of death and causing the death of another under circumstances *30 evincing a depraved indifference to human life (Penal Law § 125.25 [2]). That is the one at issue in this case. Manslaughter, second degree, is defined as recklessly causing the death of another person (Penal Law § 125.15 [1]). This court has held that both of those crimes (the first an "A-I” felony carrying a mandatory sentence of at least 15 years to life [Penal Law § 70.00], and the lesser being a "C” felony qualifying for 4 Vz to 15 years [Penal Law § 70.02]) require the same culpable mental state (People v Register, 60 NY2d 270, cert denied 466 US 953), i.e., acting recklessly when aware of and consciously disregarding a substantial and unjustifiable risk (Penal Law § 15.05 [3]). But that culpable mental state, taken alone, supports and defines only manslaughter unless elevated to murder by reckless conduct, which additionally creates a grave risk under circumstances evincing a depraved indifference to human life. The catapulting ingredients are gravity and depravity. Other synonyms used to try to understand the essence of the escalating difference include malignant, malicious, callous, cruel, wanton, unremorseful, reprehensible and the like. The semantics alone prove that the analysis necessarily includes some subjective, gradational assessment.
While the tangible content of "depraved indifference to human life” is thus elusive, the wantonness of the conduct augmenting the reckless culpable mental state must also manifest a level of callousness and extreme cruelty as to be "equal in blameworthiness to intentional murder” (People v Register, 60 NY2d 270, 275, cert denied 466 US 953, supra). I allude to some of the same case illustrations in this regard as the majority does, except I emphasize the particular escalating depravity facts that the majority avoids: firing a gun three times in a packed barroom, having boasted in advance an intention to kill someone (id.); driving a car at high speed on a crowded urban street and failing to apply the brakes after striking one person (People v Gomez, 65 NY2d 9); continuously beating a young child over a five-day period (People v Poplis, 30 NY2d 85).
The depraved indifference category of murder reflects the Legislature’s policy refinement that there is a type of reckless homicide that is so horrendous as to qualify, in a legal fiction way, for blameworthiness in the same degree as the taking of another’s life intentionally, purposefully and knowingly (see, Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law art 125, at 491; 2 LaFave & Scott, Substantive Criminal Law § 7.4). It is treated equally with the *31 common-law antecedent of premeditated murder with malice aforethought. Early cases reveal that the concept of "depraved mind” murder as an escalating factor emerged from this common-law notion and was applied in cases where, despite evidence that a defendant had no desire to kill, the conduct nonetheless demonstrated a substitutive aggravating "malice in the sense of a wicked disposition” (see, Gegan, A Case of Depraved Mind Murder, 49 St John’s L Rev 417, 423-427). Modern statutes have borrowed and recast the concept "of a wicked disposition” to speak in terms of "extreme indifference to the value of human life”. The predecessor of New York’s present statute used an "act imminently dangerous to others” and was interpreted to apply, consistent with its exception-ability, only in cases where defendant’s conduct created a danger to a multitude of persons rather than to just one individual (see, 2 Rev Stat of NY, part IV, ch I, tit I, § 5 [1829] [emphasis added]; Darry v People, 10 NY 120 [1854]). The language of the statute was expanded in 1967 to apply to persons who engage in "conduct which creates a grave risk of death to another person” and has been construed to apply to an attack directed at a single person (see, Penal Law § 125.25 [2]; People v Poplis, 30 NY2d 85, supra).
The latest significant case, involving far more egregious conduct than is present in the instant case and held to constitute depraved indifference murder, evoked a warning, albeit in dissent, of the "evisceration” of the "distinction” between manslaughter and murder (People v Register, 60 NY2d 270, 284 [Jasen, J., dissenting], supra). In my view, today’s application completes the homogenization.
In this case, a 15-year-old person stands convicted of the tragic and senseless killing of the 13-year-old brother of his best friend. The shooting occurred around three o’clock in defendant’s home on a summer afternoon. Thirteen-year-old Darrin Seifert and another youngster, Dennis Bleakley, went to defendant’s home where they were invited to defendant’s upstairs bedroom. They examined defendant’s weapons collection, which included a sawed-off shotgun. After the weapons were returned to their storage places, defendant and his two companions walked down the hallway to defendant’s parents’ room where defendant removed a 12-gauge shotgun from a gun case. Defendant asked Darrin to retrieve some shotgun shells located on a shelf in defendant’s room. Darrin and Dennis went to defendant’s room and took five shells. Three were live ammunition and two were "dummies”. Returning to *32 the master bedroom, Darrin handed the shells to defendant, who proceeded to load the shotgun with four shells. Testimony established that defendant knew two of the shells he loaded into the gun were "live” and two were "dummies”. There was also conflicting testimony as to whether the defendant understood that the gun worked in such a manner that the first shell inserted into the gun would be the last fired from the gun or vice versa. The two police investigators testified that, shortly after the incident, defendant indicated he thought he had chambered a "dummy” shell and appeared stunned when he learned the gun operated on a "first in — last out” order of fire. Defendant contradicted this testimony when he testified he had not paid attention to the order in which he loaded the shells into the gun. Both theories, in any event, suggest only recklessness, not depravity.
Moreover, after loading the gun and while standing 10 feet away from the other two boys, defendant exclaimed, "Let’s play Polish roulette. Who’s first?” Defendant raised the shotgun, pointed it at his two companions and pulled the trigger. The gun fired a live shell which hit Darrin’s right chest and shoulder area, knocking him to the floor. Defendant dropped the shotgun and ran over to Darrin, screaming, "Don’t die. I killed my best friend’s brother.” He quickly directed Dennis to go downstairs to call an ambulance, which was done. A neighbor, hearing the shot, entered the house and ran upstairs. She observed defendant straddled over Darrin’s body and heard him say, "Is he alright? Is he alright? Tell me.” When the police arrived shortly thereafter, they observed the defendant pounding his fists against the wall, crying, "I can’t believe I shot him. I can’t believe I shot my best friend. Help, please, oh my God, help.” The ambulance arrived and Darrin was taken to the hospital where he was pronounced dead on arrival.
The District Attorney presented the evidence to a Grand Jury and sought a depraved indifference murder charge against this defendant as a juvenile offender. The Grand Jury complied and a bench trial ensued after which the Trial Judge, as trier of fact, convicted on that top count. The question is whether defendant’s conduct "was of such gravity that it placed the crime upon the same level as the taking of life by premeditated design * * * [and whether] defendant’s conduct, though reckless, was equal in blameworthiness to intentional murder” (People v Register, 60 NY2d 270, 274-275, cert denied 466 US 953, supra).
*33 I disagree that defendant’s conduct qualifies for this lofty homicidal standard. He acted recklessly, of that there can be no doubt. He could also have been punished proportionately as an adult criminal, of that, too, there should not be any doubt. But the accusation and the conviction at the highest homicidal level, predicated on callous depravity and complete indifference to human life, are not supportable against this 15 year old on a sufficiency review and are starkly contradicted by the whole of the evidence adduced.
This "crime is classified as murder and the murder penalty should be imposed 'only when the degree of risk approaches certainty; that is, at the point where reckless homicide becomes knowing homicide’ ” (People v Lilly, 71 AD2d 393, 398 [Simons, J., dissenting], quoting Gegan, A Case of Depraved Mind Murder, 49 St John’s L Rev 417, 447 [emphasis added]). Here, defendant’s actions cannot be said to have created an almost certain risk of death. The mathematical probabilities, the objective state of mind evidence at and around the critical moment, the ambiguity in the evidence as to the operational order in the firing of the weapon, and all the circumstances surrounding this tragic incident all render the risk uncertain and counterindicate depravity, callousness and indifference of the level fictionally equalling premeditated, intentional murder. That central and essential element of the crime charged was not proved beyond a reasonable doubt and that has been for a very long time a classically reviewable issue in this court (People v Ledwon, 153 NY 10).
I, of course, accept the truism, repeatedly cited by the majority as a justification for its conclusion, that the evidence must be viewed in the light most favorable to the People. But I do not worship that generality nor do I believe that it displaces equally pertinent principles and analysis; nor has it overruled other cogent and relevant precedents like Ledwon (supra). Besides, if this 15 year old is to live the rest of his life with the scarlet condemnation of "depraved murderer”, he is entitled to have the entire relevant evidentiary res gestae examined within the framework of this court’s traditional powers.
The testimony of the only other eyewitness, Dennis Bleakley, established that defendant was shaken and distraught immediately upon realizing that he had shot their companion. Defendant also immediately ran to his victim and instructed Dennis to call an ambulance; the neighbor testified that when *34 she arrived on the scene, seconds after hearing the shot, defendant was kneeling over his friend’s body and crying. Similarly, the police officer who arrived on the scene testified that defendant was extremely distraught and overcome with grief. This is not evidence beyond a reasonable doubt of that hardness of heart or that malignancy of attitude qualifying as "depraved indifference” (see, People v Ledwon, 153 NY 10, supra). Frankly, the evidence proves the opposite.
Nor should evidence of the "objective circumstances surrounding the act of the shooting” — the essential elevating element of the crime — be discarded as "beside the point” and artificially cut off as of the moment of the flash of the weapon (majority opn, at 27). This is a substantial and new evidentiary restriction and one that has been rejected by a leading authority (2 LaFave & Scott, Substantive Criminal Law § 7.4, at 204-205). Indeed, the very section of that text relied upon by the majority is antithetical to the majority’s approach and supports the view advanced in this dissent in this regard (see, majority opn, at 27, n 7): "[o]n balance, it would seem that, to convict of murder, with its drastic personal consequences, subjective realization should be required”, and evidence of a defendant’s conduct in stopping and aiding a victim, whom he had struck and fatally injured, was admissible "to 'negative the idea of wickedness of disposition and hardness of heart’ required for depraved-heart murder” (see, 2 LaFave & Scott, Substantive Criminal Law § 7.4, at 205, citing Commonwealth v McLaughlin, 293 Pa 218, 142 A 213 [1928]). Under the majority’s cramped approach, one must wonder whether res gestae conduct will be foreclosed in a prosecution attempt to prove a real depravity set of circumstances in some other depraved murder case. More to the point here and for the defense side of cases yet to come, the majority appears also to be significantly preventing the evidentiary development of ameliorating or contradicting factors with respect to depravity. Both sides and the truth-seeking process itself lose with this antiseptic evidentiary embargo.
On an inextricably related issue, the majority also summarily rejects the defendant’s objection to the prosecutor’s use of prejudicial prior conduct evidence. To establish defendant’s depravity, the People introduced evidence that defendant had previously pointed an unloaded firearm at others, that he had handled a variety of guns and demonstrated to his friends how to load and unload these guns. They even introduced defendant’s magazines concerning guns and the posters that had *35 hung in his bedroom. Evidence of this conduct, of this penchant, of this hobby, and of these prior "bad acts” never should have been admitted because the probative value was nonexistent or so overwhelmingly prejudicial that the tenuous probativeness was substantially outweighed (People v Hudy, 73 NY2d 40, 54-56; People v Ventimiglia, 52 NY2d 350; People v Molineux, 168 NY 264). The Trial Judge nonetheless took the evidence over objection, stating that it bore on defendant’s familiarity with guns and tended to establish defendant’s depraved mind — and he was the sole fact finder. As to the first issue — defendant’s familiarity with guns — the evidence totally failed to show that defendant knew the order of fire of the weapon used that afternoon — the only relevant issue in this regard in the case. As to the second issue — establishing this 15-year-old’s depraved mind — the evidence of defendant’s prior acts as related to the charged event is not relevant to show defendant’s state of mind on the afternoon in question and was inappropriately devastating in its impact (see, United States v Afjehei, 869 F2d 670 [2d Cir]). If the truth be stated, we know that this evidence was admitted for only one purpose: the prosecutor’s determination to show that this 15 year old was obsessed with firearms rather than with other things which preoccupy such adolescents. This is precisely why admitting this highly prejudicial evidence constitutes reversible error (People v Ailing, 118 AD2d 960, 963-964 [dissenting opn], revd on dissenting opn 69 NY2d 637).
By condoning all this error and thus catapulting the defendant’s admittedly reckless criminal act to one "evincing depraved indifference to human life”, the court functionally and finally discards and disregards the legislatively drawn distinction between manslaughter and murder (see, People v Register, 60 NY2d 270, 284 [dissenting opn], supra; Gegan, A Case of Depraved Mind Murder, 49 St John’s L Rev 417, 447; see also, People v Marcy, 628 P2d 69, 78-81 [Colo]). Prosecutors will find the temptation legally and strategically irresistible, and overcharging traditional reckless manslaughter conduct as the more serious murderous conduct will become standard operating procedure in view of the authorized template given for that course of action. Some very disproportionate miscarriages of justice — this case is one of them — will certainly ensue from this prosecutorial leverage in elevating reckless manslaughter to murder. It is difficult to imagine, after this case, any intentional murder situation not being presented to the Grand Jury with a District Attorney’s request for a depraved indiffer *36 ence murder count as well. Thus, the exception designed as a special fictional and functional equivalent to intentional murder becomes an automatic alternative and additional top count accusation, carrying significant prejudicial baggage in its terminology alone. That devastating advantage, among others, given to the prosecution provides an unjust double opportunity for a top count murder conviction and an almost certain fallback for conviction on the lesser included crime of manslaughter.
The majority also postulates a functional per se principle for this type case that it is always — it says "generally” but provides no indication of qualifying exceptions and I can think of none — up to the trier of fact only to determine whether defendant’s actions were of such gravity as to qualify for depraved indifference murder (majority opn, at 25). This remarkable abdication of traditional demurrer and legitimate appellate review functions to unfettered prosecutorial hegemony has very grave consequences and implications for the future. If all prosecutors have to do to secure a depraved indifference murder count from their generally cooperative Grand Juries is to present the meager evidence available here against a juvenile offender, there is not much left for the defense or the trial court to do. Under CPL 210.20 (1) (b), the entire case becomes invulnerable to dismissal because the lesser manslaughter, second degree, with simple recklessness will surely lie and the court in such circumstances is absolutely forbidden from dismissing the higher count, even if not made out by the evidence. The inspect and reduce reform long sought as a fair and balanced judicial remedy for such situations generally, which would ameliorate this outrageous strategic advantage in cases like this, has year after year failed because of prosecutorial opposition (see, Assembly Bill 5110 [1989]; Assembly Bill 4459 [1987-1988]; Assembly Bill 4337 [1986]; see also, 1988 Rep of Advisory Comm on Criminal Law & Procedure, reprinted in 1988 McKinney’s Session Laws of NY, at 2369, 2430; Determinate Sentencing Report and Recommendation, NYS Comm on Sentencing Guidelines, at 97 [1985]). To this long-standing advantage, there is now added the unique fact-insulating characterization accorded to the essential aggravating element in these cases with the result that the prosecution’s discretionary authority in this respect is decreed absolute and immune from appropriate review.
As if all that were not disquieting enough, under the particular facts of this case, the conviction of this 15-year-old *37 defendant for depraved indifference murder becomes even more unsettling because, prior to 1978, persons under the age of 16 were infants, legally presumed to be without capacity to commit any crime as an adult. Children under the age of 16, proven to have committed an act which if committed by an adult would be a crime, were up to then adjudicated juvenile delinquents in Family Court (see, Family Ct Act art 3). In 1978, the Governor and Legislature, reacting to a particularly heinous criminal act by someone who would qualify only as a juvenile delinquent, carved out some narrow high level adult prosecution exceptions to the traditional infancy defense. After that date, persons aged 13 through 15 could be criminally responsible as adults for intentional and depraved indifference murder. Additionally, under the same statute, 14 and 15 year olds could be held criminally responsible for some other enumerated felonies and for felony murder only if one of the underlying intent felonies were among those enumerated in the special statute (see, Penal Law § 30.00 [2]; McQuillan, Felony Murder and The Juvenile Offender, NYLJ, Aug. 25, 1978, at 1, col 2). Notably, every crime, save one, authorized for prosecution against these 13 to 15 year olds requires intention as the culpable mental state. That one exception is depraved indifference murder, which carries the lesser culpable mental state of recklessness.
The majority avoids these objective realities and the inextricably intertwined statute, which could not be more self-evidently relevant to this adolescent defendant, even in the title of this criminal proceeding, by attributing to me a sua sponte injection of the issue into the case. They even imply that I question the wisdom of the Legislature’s policy choice in enacting the juvenile offender law, which I surely do not. I question the injustice against this defendant in the application of that exceptional authorization for this depraved indifference case, within the framework of this court’s traditional review role (People v Gruttola, 43 NY2d 116, 122-123; People v Ledwon, 153 NY 10, supra). The notion that our review power should be so "scientific” and "mechanical” should be repulsed (see, Brennan, Reason, Passion, and "The Progress of the Law”, 42 Rec AB City NY 948, 951-952 [1987]).
The boomerang of Penal Law § 30.00 (2) on this adolescent defendant catches him in a remarkable dual exception — a kind of double bind — creating an opposite anomaly from that which precipitated the juvenile offender legislation — the escape of then-juvenile delinquent Willie Bosket from the
*38 clutches of the adult criminal law (see, L 1978, ch 481; NY Times, July 20, 1978, at B2, col 6; NY Times, Nov. 17, 1979, at 27, col 1). Defendant Steven Roe, aged 15, standing alongside an adult-aged criminal over 16, is, in the practical play out, more disadvantaged than an accused adult by quirks of legislative drafting and of prosecutorial charging choices (see, e.g., CPL 300.50, 310.85; Penal Law § 30.00 [2]; § 125.25 [1] [a]; but see, ALI Model Penal Code §§210.2, 210.3 [1] [b]; Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law art 125, at 492; People v Patterson, 39 NY2d 288, 306-307 [Breitel, Ch. J., concurring], affd 432 US 197, supra). This harsh reality perverts the principle of proportionality in our criminal jurisprudence and exerts the worst kind of regressive inversion on the equal protection of our laws applied as against a 15-year-old defendant charged, tried, convicted and punished as a full adult for the highest crime possible.
Finally, to uphold this defendant’s conviction on the uppermost and most heinous level of criminal homicidal responsibility cheapens the gravity with which we treat far more serious murders, e.g., cold-blooded contract killings and the like. In the eyes of the law all the slayers are now made alike, when the perpetrators themselves know and our best instincts and intelligence tell us, too, that they are very different. Justice is disfigured by the punishment of offenders so homogeneously and, yet, so disproportionately.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander and Titone concur with Judge Hancock, Jr.; Judge Bellacosa dissents and votes to reverse in a separate opinion.
Order affirmed.