THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID WAYNE LILLY, Appellant.

Fourth Department, December 14, 1979

APPEARANCES OF COUNSEL

*Stephen Gebo* for appellant.

*Lee Clary* for respondent.

## OPINION OF THE COURT

*Per Curiam.*

Defendant was convicted of murder in the second degree, resulting from the child abuse death of a three-month-old child. The prosecution proceeded upon two theories: (1) defendant's own conduct evincing a depraved indifference to human life, resulted in the child's death; and (2) defendant aided and abetted the child's mother to bring about the death of the child. The jury's verdict of guilty does not show upon which theory the verdict was based.

Defendant contends that the trial court failed to instruct the jury properly concerning defendant's duty toward the deceased child. The court instructed the jury that, if it found that defendant, the child's mother and the child were living together as a family unit, defendant had a duty to provide medical assistance to the child. This is an oversimplification of the *in loco parentis* doctrine, which requires that an individual intend to assume all the obligations of parenthood before he will be held to those obligations *(Rutkowski v Wasko,* 286 App Div 327), and the jury's fruitless request for clarification on that issue indicates this confusion. We hold that this constitutes reversible error.

In deciding this case, three questions must be answered; (1) did the defendant inflict injuries on the baby; (2) did these injuries cause death; and (3) were the injuries inflicted with "criminal negligence" (Penal Law, § 15.05, subd 4; § 125.10); or "recklessly" (Penal Law, § 15.05, subd 3; § 125.15, subd 1); or "recklessly", "[u]nder circumstances evincing a depraved indifference to human life" (Penal Law, § 125.25, subd 2).

The record reveals that from a time prior to the birth of Vickie Lynn Arca the defendant and Janet Arca, Vickie Lynn Arca's mother, lived together as a family in all but name. The defendant contributed financially to this social unit and he

fed, handled and "disciplined" the baby. He testified that it had been his intention to marry Janet Arca and adopt her child. On July 24, 1977 this infant died of various injuries. Approximately one month before on June 26, 1977, she had been examined at a local hospital and found to be a healthy, thriving infant. After her death a visual inspection of the infant's body showed numerous bruises, puncture wounds, lacerations on her back and hemorrhages and the subsequent autopsy revealed multiple injuries to her head, body, extremities and brain. The condition of the injuries indicated that they had been inflicted over a period of several days or weeks.

■ At the trial, the defendant attempted to place the blame for the murder of Vickie Lynn Arca on the shoulders of Janet Arca. He denied ever having struck the infant, even though he had previously made a written statement in which he admitted that he had slapped her on the back and head. An eyewitness, Roger Whitmoyer, stated that during some of this period he lived with the defendant and had seen him slap the then three-month-old infant. The defendant denied that this was true. However, the defendant's landlady, Mrs. Talbot, testified that from 50 feet away during late June and early July, while sitting outside her trailer, she had heard the baby cry followed by the defendant's voice yelling "cut it out, cut it out, cut it out" and then heard the sounds of hard slaps. The defendant's response to this testimony was that the crying sound was from his dog. The slaps, he said, were inflicted on Janet Arca as part of an esoteric birthday ritual. The jury rejected his denials and explanations; nor was it necessary for the jury to make any impermissible leap of logic, to conclude that the defendant inflicted these injuries and that these injuries did cause the death of Vickie Lynn Arca. While circumstantial, in part, the proof was strong. Child beating ordinarily goes on behind closed doors and avoids the light of day. Since these incidents occur in the privacy of the home the facts are not easy to unravel. Consequently, proof in a battered baby's death will ordinarily be circumstantial in nature (People v Caprio, 47 AD2d 1), which is sometimes stronger than direct evidence (People v Benzinger, 36 NY2d 29, 32).

■ We come then to the final question of what was the defendant's intent or state of mind. The circumstantial evidence of his state of mind must come from the nature, extent and frequency of the injuries and whatever might be gathered

from defendant's admissions. Examining the injuries suffered by this baby as set forth in the record, we find that she had bruises ranging from old (brownish) to new (blue) on her face, jawbone, front anterior chest and back anterior chest; that the infant's left radius had been fractured and that the fracture could have been at least two weeks old because partial healing had begun; X rays showed multiple fractures on both sides of the baby's rib cage—some of the fractures on the right side were found to be old because, they, like the left radius, were partially healed; there were gouges on both sides of the baby's jawbone consistent with adult thumbnail gouges which were "crusted" or partially healed; there were multiple hemorrhages in the tissues beneath the skin of the scalp and that some of the hemorrhages were no more than 48 hours old; there was a large subdural hemmorhage over the right side of the brain; and the injuries to the brain occurred at different points in time.

These injuries were inflicted on a six and one-half pound baby girl by grown persons over a period of about a month (June 26-July 24). No medical attention was sought to ease the substantial pain the infant was undeniably undergoing. It is difficult for us to conclude, as does the dissent, that this evidence supports an inference that the inflictor of these fatal wounds acted only negligently or merely recklessly. Rather, we conclude that these vicious and brutal injuries are direct evidence of recklessness sufficient to prove that the death of this infant was caused "[u]nder circumstances evincing a depraved indifference to human life" (Penal Law, § 125.25, subd 2; *People v Poplis*, 30 NY2d 85). Defendant's conduct revealed a cruelty and hardness of heart at least as depraved as abandoning an intoxicated robbery victim on a cold snow-swept highway late at night *(People v Kibbe*, 35 NY2d 407).

SIMONS, J. (dissenting). Defendant has been convicted of the murder of Janet Arca's three-month-old baby, Vickie, because with "depraved indifference" to Vickie's life, he recklessly engaged in conduct which created a grave risk of death to her and which resulted in her death on July 24, 1978 (Penal Law, § 125.25, subd 2). Defendant was sentenced to a mandatory term of imprisonment of 15 years to life.[1] Pursuant to the one-count indictment, the prosecution attempted to prove that defendant criminally assaulted Vickie Arca and that his as-

---

[1]. Janet Arca was tried separately and similarly convicted.

saults were a direct cause of her death; that he aided and abetted Janet Arca in causing the death; and that he was criminally liable because, knowing Vickie's impaired physical condition, he failed to take reasonable steps for her safety.

We dissent from the majority's decision to grant a new trial on the indictment and from its resolution of the issues on this appeal. We do not believe that defendant may be convicted of murder on the proof presented and we believe the appeal presents for resolution serious and novel questions of law which the majority has not addressed.

In deciding that the proof at trial was sufficient to support conviction, the majority bases its decision to a large degree on the reprehensible nature of the crime, the baby's gross injuries, by whomever inflicted, and the difficulty of obtaining proof of guilt in this type of crime. Those considerations have never been held sufficient to lighten the prosecution's burden of proof in other criminal trials and they are not sufficient to do so in cases of infanticide. Persuaded by these considerations the majority have relied on negative and ambiguous evidence to find the prosecution has made out a case of murder. Thus the majority challenges defendant's credibility, but even if the jury believed him untruthful that fact does not create positive evidence of guilt. Next it relies upon the ambiguous testimony of Mrs. Talbot. The ambiguities are not probative of defendant's guilt, however. She testified that at different times during the summer she heard the baby cry, the defendant yell "cut it out" and the sound of hand slaps. There is no evidence of who was in the trailer on these occasions, whom defendant was speaking to, who was being slapped or who was doing the slapping. Finally the majority cite the testimony of Roger Whitmoyer, who also lived in the Arca trailer and shared expenses. But his testimony was not significantly different from defendant's and it related to a period of time in June and early July, weeks before the fatal injuries were inflicted.

At the time of trial defendant was 22 years old, in the Army and stationed at Camp Drum, New York. He had met Janet Arca in September, 1977 and dated her on one occasion that fall before his transfer to Fort Devins, Massachusetts. He returned to Watertown to visit her on weekends during the winter, however, and in April, 1978 when his unit was reassigned to Camp Drum, he began to live with her. She was married but divorce proceedings were pending and the divorce

became final in June. Janet had two children who were then in the custody of her husband and she was also pregnant with a third child. At first the couple lived with Janet's mother at the mother's apartment in Watertown, but in June they moved to nearby Gunn's Corners where they shared a trailer with another unmarried couple. When defendant began to live with Janet, he knew that she was pregnant by another man, but it was his testimony that he loved her, intended to marry her and hoped to adopt the baby. Vickie Arca was born on April 27, 1978. She was somewhat underweight and remained in the hospital a few days after Janet's discharge. She was returned to the hospital again for a week in June because she failed to "thrive" and she was seen regularly by doctors until June 26. The doctors discovered no injury or bruises on her during their examinations, and the injuries leading to her death were sustained sometime between June 26 and July 24, 1978.

The autopsy revealed that she had multiple fractured ribs (sustained at different times as determined by the degree of healing), a fractured radius of her arm, multiple hemorrhages of the scalp and right lung, bruises of the head and torso and puncture wounds and scratches under her jaw and on her back, probably caused by fingernails. The bruises to the head were caused by blows administered by a closed fist or blunt object and occurred within the 24 hours prior to death. The pathologist testified that in his opinion the immediate cause of death was cardio-respiratory arrest resulting from severe cerebral head injury and cerebral hemorrhages which could be caused by someone grabbing the baby about the chest and shaking her violently, thereby causing her head to snap back and forth, and her brain to strike her skull. He believed that the fractured radius was caused by lifting the baby by the arm.

The indictment charged depraved mind murder. To establish that crime, the People were required to prove more than "gross negligence"; they had to prove that defendant acted with "grave culpability" (People v Poplis, 30 NY2d 85, 88). The crime is classified as murder and the murder penalty should be imposed "only when the degree of risk approaches certainty; that is, at the point where reckless homicide becomes knowing homicide" (Gegan, A Case of Depraved Mind Murder, 49 St. John's L Rev 417, 447).

By way of contrast, the Penal Law defines reckless homicide

as manslaughter second degree (Penal Law, § 125.15, subd 1). A person acts recklessly when "he is aware of and consciously disregards a substantial and unjustifiable risk". The risk must be such that disregarding it constitutes "a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law, § 15.05, subd 3). An additional element is necessary, however, for nonintentional or depraved mind murder, for the statute provides that a person is guilty of murder second degree if, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another and death results (Penal Law, § 125.25, subd 2). The crime, performed "without specific homicidal intent [must be done] with a depraved kind of wantonness". The paradigmatic depraved murder is committed when one shoots into a crowd, places a time bomb in a public place or opens the door of a lion's cage in a zoo (Hechtman, Practice Commentaries, McKinney's Cons Laws of NY, Book 29, Penal Law, § 125.25 and cases cited; see, also, 8 Zett, NY Crim Prac, par 69.2[2][c], p 69-18).

The actor's state of mind in depraved murder may be said to be characterized by unmotivated wickedness, his acts characterized as particularly cruel or callous thus suggesting, if not an intent to murder, a regardlessness of human life by reason of which the actor's conduct may fairly be equated with intentional killing. A reckless killing may be the result of human frailty, of mindless carelessness, but a depraved killing is so gross that it cannot be explained except by pure malice. The severity of a defendant's conduct is judged by all the circumstances, but a depraved indifference may be shown by the extreme cruelty manifested, the helplessness of the victim, the lack of provocation for the conduct or the prolonged period over which it occurs (see *People v Poplis,* 30 NY2d 85, *supra; People v Kibbe,* 35 NY2d 407; and cf. *People v France,* 57 AD2d 432; see, also, LaFave and Scott, Criminal Law, Depraved-Heart Murder, § 70). Finally the act must be "perpetrated with a full consciousness of the probable consequences" *(Darry v People,* 10 NY 120, 148). Manifestly, child battering which results in death may in some circumstances constitute depraved mind murder (see *People v Eisenman,* 39 NY2d 810; *People v Poplis, supra; People v Santoro,* 68 AD2d 939; *People v Caprio,* 47 AD2d 1).

There is no doubt that Vickie Arca died of injuries sus-

tained during the month before her death which the jury might fairly find were inflicted recklessly and by conduct evincing a depraved indifference to human life. There is a serious question, however, as to who inflicted those injuries, defendant or Janet Arca. The direct evidence that defendant injured the baby consisted of proof that he struck the child "briskly" once on the side of the head on July. 18, that he slapped her five or six times above the buttocks for "disciplinary purposes" and that he slapped her hand "gently" to keep her from sucking her thumb. There was also circumstantial evidence that defendant had abused Vickie, but most of it was equivocal and did not exclude to a moral certainty every reasonable hypothesis of innocence (see *People v Benzinger,* 36 NY2d 29, 32; *People v Borrero,* 26 NY2d 430, 434-435).

The People were required to prove beyond a reasonable doubt that defendant's conduct was a "sufficiently direct cause" of the victim's ensuing death, an actual cause of death in the sense that it was a link in the chain of causes which actually caused the death *(People v Stewart,* 40 NY2d 692, 697; *People v Kibbe,* 35 NY2d 407, 413, *supra;* and also *Henderson v Kibbe,* 431 US 145; *Cox v People,* 80 NY 500, 516; and, see, generally, LaFave and Scott Criminal Law, Causation, § 35, pp 246-247; Marks and Paperno Criminal Law in New York under the Revised Penal Law, § 178). Their proof did not establish either conduct by defendant evincing a depraved indifference to human life or that defendant's blows caused Vickie's death.

If defendant's conviction is to stand, therefore, it must rest upon the legal proposition that defendant "engaged in conduct" (see Penal Law, § 125.25, subd 2) making him guilty of homicide as an "aider and abettor" of Janet Arca because she neglected and abused the child and because defendant had a duty to protect Vickie and to obtain necessary medical assistance for her and he failed to do so.

Section 20.00 of the Penal Law provides: "When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he * * * intentionally aids such person to engage in such conduct."

It has been held that a defendant may "aid and abet" a reckless homicide if he gives assistance or encouragement to one who he knows is acting or will act in a reckless way (see

*People v Gramaglia,* 71 AD2d 441; *State v McVay,* 47 RI 292; Manslaughter—Accessory Before Fact, Ann. 44 ALR 576; LaFave and Scott, Criminal Law, § 64, pp 510-512). If defendant's conduct was not the cause of death, however, but Janet Arca's was, he may not be liable as an aider and abettor solely because his conduct was similar to hers or because he failed to act to prevent her conduct from causing death. An aider must share the principal's purpose and possess the mental culpability required for the crime (*People v La Bruna,* 66 AD2d 300, 302; and cf. *People v La Belle,* 18 NY2d 405, 412; *People v Monaco,* 14 NY2d 43, 46). "[M]ere presence * * * where a crime is being committed * * * or the mere negative acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture" (see *United States v Stanchich,* 550 F2d 1294, 1300; *People v Santoro,* 68 AD2d 939, *supra; People v La Belle, supra; People v Le Grande,* 61 AD2d 815, 816; *United States v Peoni,* 100 F2d 401, 402; 1 Burdick, Law of Crimes, § 221, p 297).

Even assuming that Janet Arca acted recklessly with depraved indifference to human life and that defendant's conduct was reckless or negligent, the evidence in the record does not establish that the two shared a common purpose of creating a grave risk of death of her baby. First, as noted, defendant's conduct toward Vickie did not rise to the level of depraved indifference to human life. Beyond that, the evidence did not establish that defendant intentionally engaged in his reckless conduct to assist, facilitate or encourage Janet Arca in the abuse which caused Vickie's death. To the extent that he acted recklessly, his acts were independent of Janet's.

The prosecutor argued to the jury that defendant should have stopped Janet from abusing Vickie and he should have procured medical attention to save Vickie's life. The evidence, though conflicting, was sufficient to establish that defendant had knowledge that the baby had been abused, perhaps gravely so, and that if medical attention had been given to her in time, her life could have been saved. The dispute centers on defendant's duty to act.

Serious arguments have been advanced by legal commentators that criminal sanctions should be imposed upon a defendant who recognizes a victim's peril but fails to take steps which might reasonably be taken without risk to himself to

save or warn the victim (see Hughes, Criminal Omissions, 67 Yale LJ 590; LaFave and Scott, Criminal Law, § 26, pp 190-191). Nevertheless, the overwhelming weight of authority in the United States holds that there may be no criminal liability for homicide either as a principal or an aider and abettor for failure to act unless there is a legal duty to act (LaFave and Scott, Criminal Law, §§ 26, 64, p 503; 40 Am Jur 2d Homicide, §§ 88-90).[2] There are at least four situations in which the failure to act may constitute the breach of a legal duty. One may be held criminally (1) where a statute imposes a duty to care for another, e.g., sections 413 to 416 of the Family Court Act; subdivision 2 of section 260.10 of the Penal Law; (2) where one stands in a certain status relationship to another, e.g., where one voluntarily assumes a duty by marriage, conceiving children, adoption, etc., (3) by a contractual duty of care, or (4) in situations in which one person has voluntarily assumed to care for another and prevents others from doing so (see Homicide—Lack of Medical Attention, Ann. 100 ALR2d 483).

The trial court charged that the duty in this case, if there was one, rested upon the status relationship of the parties and a determination of whether defendant occupied a position *in loco parentis* to Vickie. The majority approve that ruling but hold that the court erred because it instructed the jury that if defendant, Janet and Vickie were living as a family unit, they could find that defendant occupied a position *in loco parentis.*[3] On retrial the majority would require a charge on the *in loco*

---

**2.** Even in European jurisdictions which impose criminal liability for failure to act in the absence of a legal duty to do so, the crime is not homicide even though death results (see LaFave and Scott, Criminal Law, § 26, p 191).

**3.** That portion of the charge, duly excepted to, reads as follows: "Now, the People also allege that the defendant failed to seek adequate medical attention for the infant's alleged serious injuries, in other words, that the defendant omitted to perform a duty which he may or may not have had. An omission is the failure to do something which the law says you should do. Now, if you find from the facts in this case that the relationship of the defendant to Janet Arca and Vickie Arca was such that the three of them were living together as a family unit, you may find, even though David Lilly is not the father of Vickie Arca, he may stand in Loco Parentis to the infant, which means simply that he stands in the place of a parent. If you do so find such a relationship, then the defendant had a duty to provide medical assistance to Vickie Arca and if you find he failed to perform that duty, you may consider it only in conjunction with the issue as to whether or not his acts were of a depraved and reckless nature."

The court added: "On the other hand, the failure to provide medical attention in and of itself is not sufficient to sustain a charge of murder in the second degree."

*parentis* issue consistent with the language found in *Rutkowski v Wasko* (286 App Div 327, 331).

The *Rutkowski* case was an action by an infant against his stepfather to recover for personal injuries caused to the infant by the negligence of the father. The issue before the court was whether the doctrine of parental immunity (which was intended to preserve "family unity" against "disruptive" tort claims [see *Caringe v Rubin,* 13 AD2d 593]) foreclosed the action against the stepfather. Neither that decision nor the doctrine of *in loco parentis* applies to this homicide prosecution. If defendant is criminally liable for Vickie Arca's death, it must be because he assumed a duty of care to the exclusion of those persons legally responsible for her, there was reliance upon him to supply that care and he failed to do so (see *Cowley v People,* 83 NY 464; *People v McDonald,* 49 Hun 67; *Jones v United States,* 308 F2d 307; *People v Beardsley,* 150 Mich 206; and see Child Cruelty—One in "Custody", "Control", Ann. 75 ALR3d 933; Homicide by Withholding Necessities, Ann. 61 ALR3d 1207, 1224).

The People do not satisfy that standard by showing that defendant and Janet Arca lived together and shared expenses or even by showing that defendant hoped to adopt Vickie some day. Cohabitation and such sincere good intentions do not establish the assumption of a legal duty of care. Vickie's mother was present to care for her, she had sought medical attention for her in the past and was fully capable of obtaining care for her before she died. Defendant admitted that he knew the baby was injured, although he was not aware of the severity of the injuries,[4] and he testified that he urged Janet to take her to the doctor. She refused to do so, however, because having lost custody of her two other children, she feared that she would also lose custody of Vickie. It is doubtful that a reasonable man would believe under these circumstances that he had a legal duty to do more. The majority hold that defendant did have such duty and that his concealment of the abuse and his failure to override the natural mother's wishes or interfere with the care of her child makes him guilty of murder. It might be urged with almost as much force that the other couple living in the trailer were culpable for

---

4. Although actual presence during the crime is not necessary for an aider, defendant worked daily. He also testified, and the proof does not contradict him, that he was on duty most of the 24-hour period before Vickie's death. The doctors testified that many of the head injuries were not visible until the autopsy examination.

their failure to obtain medical attention and I doubt that even a natural parent would be convicted of murder for failure to meet such a duty (see *People v Santoro,* 68 AD2d 939, *supra).* Certainly defendant should not be.

The judgment should be modified by reducing the conviction to the lesser included offense of assault third degree (see Penal Law, § 120.00, subd 2; *People v Ramos,* 20 AD2d 882; *People v May,* 9 AD2d 508), and the matter remitted for sentencing.

CARDAMONE, J. P., HANCOCK, JR., and MOULE, JJ., concur in *Per Curiam* opinion; SIMONS and CALLAHAN, JJ., dissent and vote to modify the judgment in opinion by SIMONS, J.

Judgment reversed, on the law and facts, and a new trial granted.