[769 NYS2d 249]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DARRYL STEPHENS, Appellant.

First Department, December 18, 2003

### APPEARANCES OF COUNSEL

*Robert T. Johnson, District Attorney*, Bronx County (*Lara R. Binimow* and *Peter D. Coddington* of counsel), for respondent.

*Richard L. Herzfeld* for appellant.

### OPINION OF THE COURT

Saxe, J.

This appeal requires us to consider the nature and extent of the duty owed to a child by an unrelated adult when the child resides in the adult's household along with his own children and those of his paramour. In particular, we consider whether the prosecution in this case properly relied upon the application of the "in loco parentis" doctrine to convict defendant of murder based upon a failure to provide medical care to a child who was not his biological child.

This prosecution concerns the death of nine-year-old Sabrina Green, who was, at the time, the charge of her older sister, Yvette Green. Defendant Darryl Stephens and Yvette Green had lived together since 1985; defendant was the father of 8 of Yvette's 10 children. Sabrina came to live in their household in November of 1996. Defendant and Yvette were both convicted of murder in the second degree, under Penal Law § 125.25 (4), for Sabrina's death.

Sabrina Green was born on August 28, 1988 to a crack-addicted mother, with whom she lived until her mother died in 1991. Sabrina was then cared for by a family friend, Sylvia Simmons, until Simmons died in 1996. Sabrina then briefly lived with a relative, Denise Nelson, but Nelson found Sabrina to be too "hyper" and therefore, in November 1996, she went to live in the household of her older sister Yvette. Yvette was awarded legal guardianship of Sabrina.

Sabrina had severe behavior problems. At age five she was diagnosed with attention deficit and hyperactivity disorder; the pediatric neurologist who testified at trial suggested she might also have been suffering from oppositional defiant disorder. While she had been treated with Ritalin for years with some success by the time she came to live with them, Yvette did not, or could not, continue to provide her with the medication.

Soon after she moved in, Sabrina began to regularly exhibit aggressive behavior, including throwing tantrums, hitting her

head and arms against furniture when she did not get her way, and getting into fights with the other children in the apartment and at school; she also wet her bed. She had difficulty following household rules, and in this household, a breach of these rules resulted in punishment, imposed either by Yvette or by defendant, such as having to stand in the corner, being grounded in her room, and being whipped with a belt or stick. Sabrina was punished almost daily.

Tyrone Green, Yvette's son, then 19 years old, testified that he had observed Sabrina taking food out of the refrigerator one night, a serious breach of the household rules which he went to report to Yvette and defendant. Yvette was asleep, and defendant responded to Tyrone that he "would take care of it." The next day Tyrone saw a gauze wrapping on Sabrina's hand, and he later saw that it had been burned. Almost every night thereafter, either Yvette or defendant would tie Sabrina's arms and legs to the bed with a jump rope, for the entire night. In addition, Sabrina was required to spend most of her time sitting in the hallway where she could be watched by both Yvette and defendant. The condition of her hand grew worse, and she was no longer allowed to go to school or outside to play. Despite the older children's entreaties that Sabrina be taken to a doctor, neither Yvette nor defendant did so. Yvette told the children that she was afraid to do so because she might be blamed for the injuries and have her children taken away.

Despite the testimony of Yvette's sons Tyrone and Marcus, relating that in September 1997 defendant stated that he could no longer deal with Sabrina and that Yvette was going to have to take over being in charge of her, Tyrone also testified that one morning, perhaps about a week before Sabrina died, Tyrone saw defendant hitting Sabrina with a belt 10 or 12 times.

At the time of Sabrina's death, on November 8, 1997, she was suffering from multiple conditions, including subdural hemorrhage caused by numerous blunt impacts to the head, a third-degree burn to her hand which was left untreated until infection and gangrene set in, and pneumonia. Dr. Ozuah, the physician who examined Sabrina's body at the hospital, observed bruises, some fresh, which were consistent with being hit with a belt, scars that were consistent with her hands being tied with a rope, and bed sores indicating she had been immobilized for many days. There was a severe third-degree burn to her left hand through all layers of skin, which was consistent with being held to a surface such as an iron or stove, and there

were fresh injuries on top of the burn. There were injuries to Sabrina's right hand consistent with being slammed repeatedly in a refrigerator door some time in September; the flesh was decaying and gangrenous. Dr. Ozuah also found an old injury to Sabrina's head as well as several that had been inflicted within 24 hours of her death. All the head injuries were serious, requiring a great deal of force, such as from a baseball bat, and could not have been self-inflicted by a nine-year-old banging her head on the floor.

An autopsy report revealed that Sabrina had died as the result of six recent severe blunt impact wounds to the head, as well as pneumonia caused by an infection which spread from her hands to her bloodstream and lungs. There were numerous scars, including scars to her back, thighs and legs consistent with a severe beating with a belt one week before her death.

The medical examiner who testified at trial based upon the autopsy report suggested that the cause of death was septic shock resulting from a bacterial infection in the bloodstream due to the untreated burn. It was the expressed opinion of both the examining physician and the medical examiner that Sabrina had been a victim of child abuse.

## DISCUSSION

### Sufficiency and Weight of Evidence

The provision of Penal Law § 125.25 under which defendant was charged with murder in the second degree requires that the defendant, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of serious physical injury or death to a person less than 11 years of age. The People's theory regarding defendant's guilt was that acting in concert with Yvette Green, with the requisite mental state, he had engaged in conduct which caused injuries that had resulted in Sabrina's death, and in addition, that he had failed to get her the medical care she needed or take any other steps to protect her, when he knew of her grave injuries.

Defendant's challenge to the sufficiency of the evidence is two-pronged: first, that the evidence failed to show that he was responsible for the injuries that caused Sabrina's death, and second, since he was neither the child's father nor her guardian, he had no legal duty toward Sabrina, and therefore was not legally chargeable with his mere failure to act to ensure she got medical treatment. We do not agree with his contentions.

First, there was sufficient evidence to permit the jury to find that defendant, acting in concert with Yvette, under circum-

stances evincing a depraved indifference to human life, had recklessly engaged in conduct which created a grave risk of serious physical injury or death to Sabrina, thereby causing her death.

Moreover, the evidence similarly supported the People's alternate theory, which was based upon the application of the doctrine of in loco parentis. We reject defendant's suggestion that he may not be held liable for his failure to ensure that Sabrina received necessary medical attention due to his lack of legal connection to the child.

Defendant correctly points out that since he was neither the child's parent nor her legal guardian, he may only be convicted based upon a failure to take action to protect the child from harm if a legal duty may be imposed upon him under the in loco parentis doctrine:

> "Criminal liability cannot be premised on a failure to act . . . unless the party so charged has a legal duty to act (*see, People v Spadaccini*, 124 AD2d 859, 861). A person who has no familial relationship to a child ordinarily has no legal duty to provide for it, unless it can be shown that he or she has assumed all of the responsibilities incident to parenthood. That a party has taken some part in meeting the child's daily needs is not enough; a 'full and complete . . . interest in the well-being and general welfare' of the child is necessary, as is the intent to fully assume a parental role, with the concomitant obligations to support, educate, and care for the child on an ongoing basis (*Rutkowski v Wasko*, 286 App Div 327, 331)." (*People v Myers*, 201 AD2d 855, 856 [1994].)

However, the evidence fully supports the application of the doctrine here.

*People v Myers* presented circumstances in which the in loco parentis doctrine could *not* support criminal liability. There, the court dismissed the indictment of the defendant for manslaughter (and for endangering the welfare of a child) of a two-month-old child who had died of severe dehydration and malnutrition; although the defendant was the live-in boyfriend of the infant's mother, the evidence merely showed that he contributed to household finances, occasionally purchasing formula for the infant and acting as a babysitter, not that he had "intended to shoulder any responsibility for the child's welfare" (*People v Myers*, 201 AD2d at 856).

In contrast, the evidence here reflected that Darryl Stephens was far more than a live-in boyfriend who took no part in the raising of the child. Rather, it supported the conclusion that during his long-term live-in relationship with Yvette, he "assumed all of the responsibilities incident to parenthood" (*People v Myers, supra* at 856). The 11 children living in the household, including Sabrina, were all housed, clothed, fed and supervised jointly by Yvette and defendant. Defendant took the children, including Sabrina, to school, stayed with them when Yvette was out, set down rules for them and punished them for any infractions. The testimony supports a finding that defendant treated Sabrina with the same degree of responsibility as he did the other children, not as a mere babysitter or short-term helper, but as one of the two coequal adults functioning in the role of parent.

The law applicable to the present case is not the same as that applicable to neglect proceedings under the Family Court Act, which defines a "person legally responsible" for a child to include "any other person responsible for the child's care at the relevant time" (*see* Family Ct Act § 1012 [g]), which provision is "intended to be construed broadly so as to include paramours or other nonparental persons who perform childcare duties which correspond with the traditional parent/child relationships" (*see Matter of Nathaniel TT.,* 265 AD2d 611, 612 [1999], *lv denied* 94 NY2d 757 [1999]). Nevertheless, it is instructive to consider those cases in which live-in paramours have been held to be "person[s] legally responsible" for a child.

In *People v Sheffield* (265 AD2d 258 [1999]), the defendant shared his apartment with the 11-year-old child and her mother, he called the child his "stepdaughter" and had sole custody of her on a daily basis. In *Matter of Heather U.* (220 AD2d 810 [1995]), respondent had been living with the subject child's mother in a family-like setting for approximately three years, had fathered her youngest child, and was a regular member of the subject child's household.

Similarly, in *People v Carroll* (244 AD2d 104, 107 [1998], *affd* 93 NY2d 564 [1999]), this Court upheld a prosecution of a nonparent for endangering the welfare of a child under Penal Law § 260.10 (2), which applies to a "parent, guardian or other person legally charged with the care or custody of a child," because the evidence showed that the nonparent has assumed the role of stepparent during the period in question.

Like the statutes defining neglect as committed by nonrelatives (*see* Family Ct Act § 1012 [g]) and endangerment of a child

as committed by nonrelatives (*see* Penal Law § 260.10 [2]), the in loco parentis doctrine requires consideration of whether the person charged actually undertook the fundamental responsibilities that are normally those of a parent. Its application here was entirely proper.

Defendant argues that, despite his serving in a parental capacity for all the other children living in his home, including the two who were not his natural children, he could relinquish that role for Yvette's young sister and ward by the simple expedient of making an announcement to that effect. However, even assuming that he could have successfully eradicated, through a pronouncement, the responsibility he had previously undertaken, so as to eliminate Sabrina from his sphere of responsibilities, the evidence makes it unnecessary for us to definitively decide that point. Even if defendant made such pronouncement, the testimony that he continued to take part in the ongoing punishments of Sabrina up until just days before her death, and the lack of evidence that he took any other steps to remove all responsibility for her from his life, permit the conclusion that any such pronouncement did not reflect any actual change in his previous parental posture toward her.

The evidence was legally sufficient to prove beyond a reasonable doubt that defendant was responsible for the victim's care at the time of her death, and that, acting in concert with Yvette, under circumstances evincing a depraved indifference to human life, he recklessly engaged in conduct which created a grave risk of serious physical injury or death to Sabrina (*see People v Contes*, 60 NY2d 620 [1983]). Moreover, the verdict was not against the weight of the evidence (*see* CPL 470.15 [5]; *People v Bleakley*, 69 NY2d 490 [1987]).

*Jury Charge*

Defendant's argument that the court failed to instruct the jury that his obligation to provide medical care had to be proven beyond a reasonable doubt is both unpreserved and without merit. The court delivered both an in loco parentis charge and a reasonable doubt charge, the latter of which emphasized that the evidence must "establish beyond a reasonable doubt each and every essential element of the crimes charged." No objection was raised to the court's instructions regarding defendant's duty to ensure Sabrina received necessary medical care. The charge was not rendered deficient by the fact that the court did not repeat, after describing each element individually, that it had to be established beyond a reasonable doubt.

The court's acting-in-concert charge was proper and consistent with *People v Brathwaite* (63 NY2d 839 [1984]) and *People v Sanchez* (98 NY2d 373 [2002]). The court did not say that mere recklessness was all that was required to convict defendant of murder in the second degree based upon his acting in concert with Yvette, but rather that the jury must find that he acted recklessly "under circumstances evincing a depraved indifference to human life" that created "a grave risk of serious physical injury or death to a person less than 11 years old, and thereby cause[d] the death of such person." The court specifically stated that it was essential that the People prove that both defendant and Yvette "acted with the mental culpability required for the commission of the crimes charged."

There was no error in the court's responses to the jury's notes.

*Trial Rulings*

We find no error in the court's evidentiary rulings. The two medical experts who gave testimony on the issue of battered child syndrome possessed sufficient qualifications to do so (*see People v Kinder*, 75 AD2d 34 [1980], *lv denied* 51 NY2d 732 [1980]). The autopsy photographs were necessary to demonstrate the extent of Sabrina's physical deterioration, in light of Tyrone's testimony that she had looked "fine" shortly before her death, and in order to rebut defendant's claims that he had not known of Sabrina's desperate need for help and would have gotten it for her if he had (*see People v Sims*, 110 AD2d 214, 222 [1985], *lv denied* 67 NY2d 657 [1986]). The "before" photograph, which was taken just prior to Sabrina's removal by Yvette from the Children's Storefront School, and which depicts her as smiling and healthy, was necessary to demonstrate the drastic change that took place after she came into defendant's care. Defendant's remaining arguments regarding the admission of evidence are without merit.

The prosecutor's summation was proper, and defense counsel's summation was not unfairly restricted.

*Sentencing*

The court properly denied defendant's requested adjournment of sentencing. The desire to present witnesses and to prepare a written memorandum chronicling defendant's law-abiding life did not justify an adjournment because there was no need to elaborate on that point. Nor did defendant's lack of any prior involvement with the criminal justice system suffice as a mitigating factor given the nature of this case. Under the facts

of this case, we do not find the sentence here to be unduly harsh (*see People v Delgado*, 80 NY2d 780, 783 [1992]).

Accordingly, the judgment of the Supreme Court, Bronx County (Alexander Hunter, J.), rendered January 10, 2000, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 25 years to life, should be affirmed.

BUCKLEY, P.J., TOM, SULLIVAN and ROSENBERGER, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered January 10, 2000, affirmed.