[937 NYS2d 334]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SHAWN J. MUNCK, Appellant.

Third Department, December 29, 2011

**APPEARANCES OF COUNSEL**

*Teresa C. Mulliken*, Harpersfield, for appellant.

*Gerald F. Mollen, District Attorney*, Binghamton (*Rita M. Basile* of counsel), for respondent.

**OPINION OF THE COURT**

SPAIN, J.

In February 2008, defendant, age 22, lived with his brother,

Peter Munck, age 12, in the Broome County home of their grandmother, who had custody of them and their sister all of their lives. On February 5, 2008, the grandmother entered the hospital for emergency surgery, leaving defendant to care for Peter during her anticipated five-day hospital stay which, due to serious medical complications, extended into several weeks. The sister was away at college. On Friday, February 15, Peter was found deceased in his bed by his great-aunt, and an autopsy determined that he had died from internal bleeding. Defendant was charged in an indictment with depraved indifference murder and assault in the second degree.

At trial, the People presented the testimony of the law enforcement officer who questioned defendant, and defendant's friend, Joe Menard, who had been staying with defendant and Peter during the grandmother's hospitalization. Defendant and Menard were the only people who saw Peter during the relevant period leading up to his death. This testimony established that on the evening of Tuesday, February 12, 2008, defendant was home with Menard and Peter. According to defendant's statements to police, Peter came home from school that day and said he did not feel well. Defendant told him to go to bed and he did. Around dinnertime, Peter came out of his first floor bedroom and ate some dinner that defendant had prepared, and he watched television with defendant and Menard. Peter resisted defendant's request that he go back to bed because he had not been feeling well. Peter began punching defendant, prompting defendant to grab him by the arms and physically put him in bed. When Peter came out of his bedroom and began kicking defendant, defendant took him down and Peter landed on the kitchen floor on his back. Defendant, wearing hiking boots, held Peter down for 30 to 60 seconds by pressing his right foot on Peter's abdomen, during which Peter unsuccessfully tried to get up. When released, Peter went to his bedroom and went to bed.

Menard, the only other witness, testified that he saw defendant and Peter engage in what he perceived as "horseplay" in the kitchen, observing that when defendant was holding Peter down with his foot, both brothers were laughing; he further described the interaction of the brothers during his stay as loving and affectionate. Both defendant's statement and Menard's testimony recounted that—as he held his foot on Peter's abdomen—defendant held on to the refrigerator and a chair keeping most of his weight off the foot on Peter, and Menard further testified that Peter did not look like he was hurt or in any pain.

Thereafter, defendant and Menard watched television and movies and listened to music in the living room while Peter remained in his bedroom.

At around 8:00 P.M., defendant and Menard heard a loud scream and defendant rushed to Peter's bedroom to check on him. Menard, who followed defendant, testified that when he arrived at the bedroom, the screaming had stopped, defendant was leaving the bedroom and, before defendant closed the door, Menard saw Peter roll over on his side. Defendant told Menard, who did not enter, that Peter was having a nightmare. Defendant later told the police that Peter looked "passed out" on his bed, and that he believed that Peter was hurt because of the incident in the kitchen, but that he did not call for help because he was scared. At 4:00 A.M. the next morning, Wednesday, February 13, 2008, defendant and Menard were asleep when they again heard Peter scream loudly; defendant immediately went in to check on him and observed him sweating and "rolling in bed from side to side." Defendant wiped the sweat from Peter's face with a washcloth and later told Menard that Peter was having another bad dream. Menard described Peter's screams as loud and "horrifying," but went back to sleep after defendant went in to check on him. There was no testimony that Peter said anything, asked for help or continued to cry out. That is the last time that defendant—or anyone—saw Peter alive; when defendant awoke hours later and checked on Peter, he knew he was dead but did not tell anyone or seek help.

Defendant continued to periodically "check" on Peter over the course of the next two days, during which time he and Menard came and went, watched television and played games in the living room. On Thursday, February 14, 2008, defendant communicated with an online friend via MySpace, telling her his brother was dead and that he thought he had killed him. Finally, on Friday, February 15, their great-aunt came over with food, discovered Peter in his bed and summoned emergency personnel, who declared Peter deceased.

An autopsy determined that Peter had died from internal bleeding due to an "extremely rare" small tear in an abdominal artery (the inferior mesenteric artery) where it branches off the aorta adjacent to his spine. The pathologist, called as a witness by the People, described it as "a small break in the blood vessel," which she opined was caused by blunt force trauma to the abdomen, concluding that "[a]ny blunt force" or "significant pressure" to the abdominal area could have caused the tear.

Significantly, the pathologist explained that the vessel that tore had been already weakened by a prior similar injury of unknown origin that had healed and scarred and that, as a consequence, the force required to cause this fatal injury "would not have to have been very severe," as the weakened artery would have been "brittle" and would have torn more easily. In addition, Peter was "very skinny" (about 5 feet tall and 80 pounds), and the very small space between his abdomen and spine when lying on the floor would have made him more susceptible to injury.[1] The pathologist further testified that the tear caused a slow bleed, which could have lasted—at most—one day but probably about six hours, although she could not say with scientific certainty how long the bleeding lasted before the boy's death; the resulting accumulation of blood would have been very painful, making getting up or calling for help impossible, and he would have lost consciousness prior to his death. The pathologist saw no evidence of defensive wounds on Peter.

A vascular surgeon, also called by the People, reviewed the autopsy report and concurred that the arterial tear that led to Peter's death and the preexisting injury were very rare, and that the scarring would have made the artery more susceptible to tearing. He opined that it was very difficult to estimate how much force had been applied, how quickly Peter became incapacitated, or the speed of his blood loss. He concluded that a tear like this would possibly have been surgically treatable if it had been timely diagnosed and the person had not progressed into irreversible shock.

At the close of the People's proof, County Court, based on the insufficiency of the evidence, dismissed the depraved indifference murder count and charged the jury on the lesser included offenses of manslaughter in the second degree and criminally negligent homicide, as well as the assault in the second degree count. Defendant was acquitted of all charges except criminally negligent homicide, and was sentenced to time served, having spent two years in jail awaiting trial, and a probation term of five years. Defendant now appeals.

■ Initially, defendant argues that County Court erred in denying his motion to suppress his statements to Detective Sergeant Fred Akshar of the Broome County Sheriff's Depart-

---

1. The pathologist also noted "very recent" grip-like bruises to Peter's right arm that occurred within four to six hours before death, consistent with defendant's description of holding Peter's arms while forcefully putting him in bed.

ment, claiming that they were involuntarily obtained. Defendant also contends that Akshar deceptively obtained access to his MySpace account.

The testimony at the *Huntley/Mapp* hearing established that when police arrived at the home on February 15, 2008, Peter was deceased and the cause of death was unknown. Defendant and Menard voluntarily accompanied sheriff's deputies to the local fire station for questioning regarding the events of the preceding days. Defendant recounted their activities since Tuesday, February 12, indicating that he last saw Peter alive in his bed in the early morning hours of Wednesday, February 13, and provided a signed written statement. While defendant received oral *Miranda* warnings, which he agreed to waive, that interview was voluntary and noncustodial, no violation of his rights occurred and he was allowed to leave. Toward the end of the questioning, when Akshar feigned interest in MySpace Web page designs, defendant voluntarily provided his username and password to his accounts and verbally agreed to let Akshar access them. In our view, contrary to defendant's claim, Akshar did not use impermissible or fundamentally unfair or deceptive tactics to gain access to these accounts (*see People v Tarsia*, 50 NY2d 1, 11 [1980]).

By the next morning, February 16, 2008, the autopsy results were known to police and Akshar had viewed defendant's MySpace messages. Akshar went to speak to defendant at Menard's house, and defendant agreed to go with him for further questioning, which occurred in an interview room at the Sheriff's Department. Defendant, who was not questioned en route, again received *Miranda* warnings at the outset of the interview, around 10:51 A.M., waived his rights and agreed to answer questions. The entire interview, which lasted about 4½ hours, was recorded and the videotapes were received in evidence at the hearing. A review of the videorecordings demonstrates that defendant did not object to the questions or ask for an attorney or to make a phone call, and he was periodically left alone, allowed to smoke and offered food and beverages. We do not find that the tactics employed were impermissibly deceptive, coercive or threatening such that they were likely to induce a false confession (*see People v Dishaw*, 30 AD3d 689, 690 [2006], *lv denied* 7 NY3d 787 [2006]; *People v Serrano*, 14 AD3d 874, 875 [2005], *lv denied* 4 NY3d 803 [2005]; *see also* CPL 60.45 [1]; *People v Tarsia*, 50 NY2d at 11). Despite Akshar's unrelenting efforts, defendant steadfastly denied accusations that he had

stomped on Peter's abdomen or kicked him, instead maintaining that he had only applied enough pressure to hold Peter down. Defendant subsequently reviewed and signed a written statement recorded in a question and answer format and signed a consent form allowing access to his MySpace account. The record supports the denial of defendant's motion to suppress.

■ Next, defendant argues that neither his conduct in pressing his foot on his brother's abdomen to hold him down nor his conduct in failing to thereafter recognize that emergency medical care was required and to obtain such care constituted criminal negligence. Further, defendant argues that County Court committed reversible error in failing to instruct the jury on the essential requirement that he could only be guilty of criminal negligence for failure to summon emergency medical care, an act of omission, if—as a nonparent and a nonlegal guardian—he had a duty imposed by law to seek medical care for his brother.

It is not disputed that defendant's alleged failure to act was a fundamental and pervasive theory underlying this trial. As County Court provided no instruction to the jury regarding how to ascertain defendant's duty, if any, to obtain medical care for his brother, a requirement not explicit in the statute but, rather, based upon case law (*see People v Ford*, 11 NY3d 875, 878 [2008]), it failed to adequately "state the material legal principles applicable to [this] case" (CPL 300.10 [2]). Although this error was not preserved at trial, we exercise our interest of justice jurisdiction to take corrective action given our conclusion, which we find inescapable, that the failure to so charge the jury deprived defendant of a fair trial (*see* CPL 470.05, 470.15 [6] [a]; *People v Porter*, 82 AD3d 1412, 1413 [2011], *lv denied* 16 NY3d 898 [2011]).

"A person is guilty of criminally negligent homicide when, with criminal negligence, he [or she] causes the death of another person" (Penal Law § 125.10). A person is said to act with the culpable mental state of criminal negligence—as to a result—when he or she "fails to perceive a substantial and unjustifiable risk that such result will occur . . . [and] [t]he risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation" (Penal Law § 15.05 [4]; *see People v Cabrera*, 10 NY3d 370, 375-376 [2008]). At what point a negligent or careless act rises to the level of *criminal* negligence "depends, of course, entirely on the circumstances of the particular conduct" (*People v Haney*,

30 NY2d 328, 335 [1972]), as this is a crime "of general application, encompassing an infinite variety of conduct, which consists both of acts of commission and omission" (*id.* at 335 n 8; *see* Penal Law § 15.00 [3]; § 15.05; *see also People v Henson*, 33 NY2d 63, 68-70 [1973]). However, "criminal liability cannot be predicated upon every careless act merely because [the] carelessness results in another's death . . . [and] should not be imposed unless the inadvertent risk created by the conduct would be apparent to anyone who shares the community's general sense of right and wrong" (*People v Ricardo B.*, 73 NY2d 228, 235-236 [1989]). Criminal negligence requires appreciably more serious carelessness than does civil negligence, and "requires a defendant to have engaged in some blameworthy conduct creating or contributing to a substantial and unjustifiable risk of a proscribed result; nonperception of a risk, even if [the proscribed result occurs], is not enough" (*People v Conway*, 6 NY3d 869, 872 [2006] [internal quotation marks and citation omitted]; *accord People v Cabrera*, 10 NY3d at 376; *People v Boutin*, 75 NY2d 692, 696 [1990]; *see People v McGrantham*, 12 NY3d 892, 894 [2009]).

As noted, the People pursued the dual theories that defendant's conduct in pressing his booted foot on Peter's abdomen and his failure to seek medical help thereafter both constituted criminal negligence. Criminal liability may be based on an "act" (Penal Law § 15.00 [a]) or an "omission," which means "a failure to perform an act as to which a duty of performance is imposed by law" (Penal Law § 15.00 [3]; *see* § 15.00 [4]; *People v Wong*, 81 NY2d 600, 607 [1993]). Under established law, "[p]arents have a nondelegable affirmative duty to provide their children with adequate medical care [and,] [t]hus, a parent's failure to fulfill that duty can form the basis of a homicide charge" (*People v Steinberg*, 79 NY2d 673, 680 [1992] [citations omitted]; *see People v Henson*, 33 NY2d at 69; *see e.g. People v Lewie*, 67 AD3d 1056, 1061-1062 [2009], *mod* 17 NY3d 348 [2011]; *People v McLain*, 80 AD3d 992, 996 [2011], *lv denied* 16 NY3d 897 [2011]; *People v Rose*, 41 AD3d 1033, 1034 [2007], *lv denied* 9 NY3d 926 [2007]).

Defendant is correct that since he was neither the parent nor the legal guardian of Peter, his brother, he could only be convicted of criminal negligence for failure to seek medical care if a legal duty was imposed upon him under the doctrine of in

loco parentis[2] (*see People v Stephens*, 3 AD3d 57, 61 [2003]; *People v Goddard*, 206 AD2d 653, 655 [1994]; *People v Myers*, 201 AD2d 855, 856 [1994]). A nonparent to a child "ordinarily has no legal duty to provide for [the child], unless it can be shown that he or she has assumed all of the responsibilities incident to parenthood" (*People v Stephens*, 3 AD3d at 61; *see People v Goddard*, 206 AD2d at 655).[3] Under the seminal opinion issued in *Rutkowski v Wasko* (286 App Div 327, 331 [1955]),[4] this Court explained that *"[i]n loco parentis* refers to a person who has fully put himself [or herself] in the situation of a lawful parent by assuming *all* the obligations incident to the parental relationship and who actually discharges those obligations" (*id.* at 331).[5] The Court of Appeals and all Departments

2. Notably, the People did not—at trial—rely on the theory of a duty imposed due to the creation of a peril, i.e., they did not argue that defendant's act in holding Peter down with a booted foot (whether criminal or not) created the peril and, thus, gave rise to a legal duty upon defendant to seek medical care (*see Henderson v Kibbe*, 431 US 145 [1977]).

3. While many of the cases refer to this doctrine as applying to a person with "no familial relationship to a child" (*People v Stephens*, 3 AD3d at 61; *see People v Myers*, 201 AD2d at 856), the cases make clear that in the absence of a *parental* (or legal guardian) duty, a duty must exist under the in loco parentis doctrine as to any nonparent, whether related or unrelated (*see e.g. Hadden v Kero-Sun, Inc.*, 197 AD2d 668, 668-669 [1993] [question of fact whether grandparents are acting in loco parentis to grandchild living in their home]; *Rutkowski v Wasko*, 286 App Div 327, 330-331 [1955] [question of fact whether stepfather acted in loco parentis to child who resided with him and mother]).

4. *Rutkowski* addressed the issue of whether a stepfather stood in loco parentis to his stepson (his wife's child) so as to preclude the stepson from maintaining an action for ordinary negligence against him as a parent (*Rutkowski v Wasko*, 286 App Div at 329-330). While a civil case, its articulation of the definition of in loco parentis (*id.* at 331) has been widely adopted in criminal cases, among others (*see People v Stephens*, 3 AD3d at 61; *People v Goddard*, 206 AD2d at 655; *People v Myers*, 201 AD2d at 856; *People v Lilly*, 71 AD2d 393, 402-403 [1979]).

5. By comparison, a Family Ct Act article 10 neglect or abuse petition can be brought against any "[p]erson legally responsible" for the care of a child, including the child's guardian, custodian or *"any other person responsible for the child's care at the relevant time"* (Family Ct Act § 1012 [g] [emphasis added]). The criminal charge of endangering the welfare of a child may be brought against "a parent, guardian or other *person legally charged with the care or custody of a child* [under 18]" (Penal Law § 260.10 [2] [emphasis added]). The Court of Appeals has read these highlighted provisions as coextensive, both requiring that the person charged acted as the "functional equivalent of a parent" (*People v Carroll*, 93 NY2d 564, 569 [1999], quoting *Matter of Yolanda D.*, 88 NY2d 790, 796 [1996]). The Court has also clarified that "whether a person stands in loco parentis to a child is a separate inquiry from whether such a person acts as the functional equivalent of a parent" (*Matter of Yolanda D.*, 88 NY2d at 796). Unlike the in loco parentis doctrine requiring the assumption of

of the Appellate Division have followed that definition (*see Johnson v Jamaica Hosp.*, 62 NY2d 523, 529 [1984] [in loco parentis "requires more than mere temporary care and custody; an intent to support and care for the child on a permanent basis must be shown"]; *People v Stephens*, 3 AD3d at 61 [1st Dept 2003]; *Hadden v Kero-Sun, Inc.*, 197 AD2d 668, 669 [2d Dept 1993]; *People v Lilly*, 71 AD2d 393, 394 [4th Dept 1979]).

Critically, *Rutkowski* emphasized that "[t]he assumption of the parental relationship is *largely a question of intention* which should not lightly or hastily be inferred, but which may be shown by the acts and declarations of the person alleged to stand in that relation" (*Rutkowski v Wasko*, 286 App Div at 331 [emphasis added]; *see Matter of Yolanda D.*, 88 NY2d 790, 796 [1996]).

> "Whether a [person] with whom a minor resides stands *in loco parentis* is generally a *question of fact* . . . [and,] [w]here the evidence on the issue is in conflict or where different inferences may reasonably be drawn from the evidence, the issue should not be resolved as a matter of law" (*Rutkowski v Wasko*, 286 App Div at 331-332 [emphasis added]; *accord People v Stephens*, 3 AD3d at 61-62 [nonrelative boyfriend of mother stood in loco parentis because he coparented with mother]; *People v Goddard*, 206 AD2d at 654-655 [unrelated babysitter did not agree to assume all parental duties]; *People v Myers*, 201 AD2d at 856 [boyfriend of child's mother did not assume responsibility for child]; *People v Lilly*, 71 AD2d at 394 [depraved indifference murder conviction reversed against boyfriend because trial court gave overly broad charge that if the defendant was living with child and mother as a family unit, he had a duty and stood in loco parentis]).

While contractual adult babysitters have been held to have the same affirmative responsibility as parents to seek medical care for a young and helpless child (*see People v Wong*, 81 NY2d 600, 607-608 [1993]), unrelated casual babysitters have not (*see People v Goddard*, 206 AD2d at 655).

---

all parental duties in order to impose a duty on a nonparent, "[a] person may act as the functional equivalent of a parent [and be charged with endangering the welfare of a child or abuse/neglect] even though that person assumes only temporary care or custody of the child" (*People v Carroll*, 93 NY2d at 569-570).

Here, at trial the People focused extensively on defendant's conduct after Peter went to bed in pursuit of the alternate, independent theory that defendant was criminally negligent for failing to seek medical care for him. However, the jury was provided with absolutely no guidance concerning defendant's duty—if any—toward Peter (in the original charge or either of the two read backs on this charge), a threshold prerequisite to a finding of criminal liability based upon a nonparent's failure to seek medical care for a child. Indeed, the jury was left to speculate or to assume—as the People did in their closing argument—that defendant had a duty to his brother when the jury should have been instructed to examine all of the facts and circumstances under the proper standard—i.e., that defendant must have intended to assume all obligations incident to a parental relationship and actually discharged those obligations (see *Rutkowski v Wasko*, 286 App Div at 331).

Significantly, different inferences could reasonably have been drawn by the jury from the evidence at trial, some arguably supporting a finding of in loco parentis and others strongly suggestive of the conclusion that defendant had no such intention to assume all of the obligations incident to a parental relationship. On the one hand, defendant fed Peter at times, told him to go to bed, checked on him after he went to bed, may have called into school weeks earlier to report that Peter was ill, and helped Peter put in eye drops the Friday before (when he came home from school with pinkeye after their great-aunt had taken him to a clinic). Defendant also told police, after Peter died, that he was "responsible" for him, and Peter told a school social worker that his older brother was caring for him at home while his grandmother was hospitalized. On the other hand, there was no testimony from the grandmother[6] or any other evidence that defendant had actually agreed to care for all of Peter's needs in a parental capacity during her hospitalization or had done so at that time or previously.[7] Defendant's sister, who was away at college during this time, testified that she considered the

---

**6.** The grandmother simply testified that, as far as she was concerned, when she went into the hospital defendant was able to take care of Peter in her absence and she trusted him; she left her uncle's phone number on the refrigerator in case defendant needed him. She had also left defendant and Peter home the week prior, during a three-day emergency admission into the hospital.

**7.** The grandmother testified that defendant and Peter had a "loving" relationship and often "horse played" together, but that defendant usually came home after Peter was in bed for the night.

grandmother to be the caretaker and parent to all three siblings. The evidence demonstrated that while defendant on occasion met some of Peter's needs, defendant and the sister left Peter alone at times, including in the evenings. There was no testimony that defendant awoke in the morning to get Peter ready for school or helped him with homework. Defendant was not listed as an emergency contact at his school (only the grandmother was) and defendant did not call in to school to report Peter as sick that week. Indeed, the proof would support the conclusion that defendant was an immature unemployed 22 year old who was dependent on his grandmother and who was not in school or expected to work, who spent his time on the computer and watching television and movies with his friends, who exercised only minimal care and supervision of his brother, and was totally unprepared to take on the responsibilities thrust upon him.

Unfortunately, neither the prosecutor, defense counsel nor County Court raised the issue of the necessity for a jury charge on the central issue of defendant's duty, if any, as a nonparent to Peter. As a result, the jury never had the opportunity to resolve the conflicting evidence from which different inferences could reasonably be drawn regarding defendant's intent, and never made the threshold determination whether defendant's failure to act was criminal because he had a duty to seek medical care for Peter. Where, as here, "different inferences may reasonably be drawn from the evidence, the issue should not be resolved as a matter of law" at trial or for the first time on appeal, when the jury never considered the issue (*Rutkowski v Wasko*, 286 App Div at 331-332).

Furthermore, because the lesser included charge of criminally negligent homicide was prosecuted under both an act and an omission theory, and the charge as given did not direct the jury to specify on which theory it was relying in reaching its verdict, it is impossible for our Court to ascertain the impact of this failure to charge on the verdict. It is noteworthy that, in sentencing defendant, County Court expressly concluded that while defendant's act in pressing his foot on Peter's abdomen caused his death, it was not criminal because he could not have known that it injured Peter's already weakened blood vessel, but that what made defendant's conduct constitute criminal negligence was his failure to thereafter obtain medical care for him. Thus, on these facts, the failure to provide any instruction to the jury on the in loco parentis doctrine was reversible error (*see Jones v*

*United States*, 308 F2d 307, 310-311 [DC Cir 1962]; *People v Lilly*, 71 AD2d at 394).[8] Since the murder count was dismissed at trial for insufficient evidence and defendant was acquitted of the only other count in the indictment (for assault), the indictment must be dismissed, without prejudice (*see People v McAdams*, 22 AD3d 885, 886 [2005]).

MERCURE, A.P.J. (dissenting). Under the facts and circumstances of this case, we would not invoke this Court's interest of justice power to reverse defendant's conviction. Therefore, we respectfully dissent.

At the outset, we take no issue with the majority's conclusion that County Court's instructions to the jury should have included sufficient guidance to enable the jurors to determine whether defendant had a legal duty to seek medical care for Peter. As the majority recognizes, however, defendant's failure to object to that omission at trial, when corrective action could have been taken by the court, renders that issue unpreserved for appellate review. Although this Court is statutorily authorized to reverse defendant's conviction as a matter of discretion in the interest of justice (*see* CPL 470.15 [3] [c]; [6] [a]), for the reasons that follow, we disagree with the majority's decision to exercise that extraordinary power in this case.

Most significantly, it must be observed that the in loco parentis standard, as articulated by the majority, would require not only that "defendant must have intended to assume all obligations incident to a parental relationship," but also that defendant "actually discharged those [assumed] obligations." In loco parentis is a civil concept that has been incorporated into criminal law, and the latter element has not heretofore been required to be proved separately in the criminal context (*see People v Stephens*, 3 AD3d 57, 61 [2003]; *People v Goddard*, 206 AD2d 653, 655 [1994]; *People v Myers*, 201 AD2d 855, 856 [1994]; *People v Spadaccini*, 124 AD2d 859, 860 [1986]; *People v Lilly*, 71 AD2d 393, 394 [1979]). Without taking a position on the appropriateness of imposing this requirement as a separate element to be proved beyond a reasonable doubt, we believe that this Court should decline to reverse defendant's conviction on the basis of this error. As the majority correctly acknowledges, the law in this area has not developed to the point that a pattern jury charge has been issued on the in loco parentis doctrine. More-

---

8. We are mindful that the pattern jury instructions do not contain a charge on the in loco parentis doctrine.

over, "a reversal by the Appellate Division based on claimed trial error to which objection is not taken presents no question[ ] of law for appellate review" by the Court of Appeals (*People v Dercole*, 52 NY2d 956, 957 [1981]; *see* CPL 470.35 [2] [a]; 470.05 [2]). In other words, the legal standard presented here involves a body of law that is still developing, yet the majority's extensive discussion of that standard is insulated from review by our State's highest court because the majority is reversing as a matter of discretion in the interest of justice.

Even if the aforementioned obstacle were removed, discretionary action would not be warranted. Notably, it is unclear under which theory the jury found defendant to be criminally negligent—for pressing his booted foot on his brother's abdomen, or for failing to seek medical attention. That is, it is unclear that a proper instruction on defendant's legal duty could have resulted in a finding that he was not criminally culpable. In any event, the facts and circumstances of this case do not cry out for the invocation of our interest of justice power.

For the reasons stated above, we would decline to exercise this Court's interest of justice jurisdiction to reverse defendant's conviction.

MALONE JR. and KAVANAGH, JJ., concur with SPAIN, J.; MERCURE, A.P.J., and McCARTHY, J., dissent in a separate opinion by MERCURE, A.P.J.

Ordered that the judgment is reversed, as a matter of discretion in the interest of justice, and indictment dismissed, without prejudice to the People to re-present any appropriate charges to another grand jury.